INTERNATIONAL SPIKE,
INC., Appellant,

v.

KENTUCKY UNEMPLOYMENT INSURANCE COMMISSION, DEPARTMENT FOR HUMAN RESOURCES, Commonwealth of Kentucky; Henrietta White; and Walfina Mae Tubbs, Appellees.

INTERNATIONAL SPIKE,
INC., Appellant,

v.

KENTUCKY UNEMPLOYMENT INSURANCE COMMISSION, DEPARTMENT FOR HUMAN RESOURCES, Commonwealth of Kentucky; and Diane Clay Tubbs, Appellees.

Court of Appeals of Kentucky.

Dec. 5, 1980.

William W. Allen, Gess, Mattingly, Saunier & Atchison, Lexington, for appellant.

Robert J. McDaniel, Paris, for appellees, Walfina Tubbs and Henrietta White.

Paul F. Fauri, Gen. Counsel, R. Hughes Walker, Staff Atty., Dept. for Human Resources, Frankfort, for appellee, Ky. Unemployment Ins. Commission.

Diane Clay Tubbs, pro se.

Before HOGGE, LESTER and WHITE, JJ.

LESTER, Judge.

This is an unemployment compensation case in which International Spike, Inc. appeals from judgments of the Bourbon Circuit Court affirming orders of the Kentucky Unemployment Insurance Commission holding that Walfina Mae Tubbs and Henrietta White (in 80–CA–655–MR) and Diane Clay Tubbs (in 80–CA–656–MR) had good cause for voluntarily quitting their jobs and thus, were not disqualified from receiving unemployment compensation benefits.

Each of the claimants worked as spike packagers for appellant. All three quit their jobs when appellant transferred them from the plant food spike line, where they earned wages of $2.65 per hour *plus a production bonus*, to the tree food spike line, where they earned $3.30 per hour where such a bonus was unavailable.

Henrietta White and Walfina Tubbs had worked for appellant for over 14 months when, according to their testimony, they were notified that they were being moved permanently to the tree food line, where they could earn a gross pay of $132.00 for their 40–hour week. In comparison, because they were among the appellant's fastest packers, they had each grossed $195.00 per week, *including production bonuses*, for the past six months on the plant food spike line. Thus, these claimants faced a 32% reduction in gross weekly pay. By way of brief, International Spike attempts to divert this court from the total earnings concept to one of higher wages by repeated references to increased hourly income on the tree food line when in actuality, the gross pay on the plant spike packing line is greater by virtue of the production bonus.

After determining that appellant intended their shift to be permanent, the claimants quit their jobs on November 21, 1978, rather than accepting the pay reduction. Subsequent to separate hearings (at which only the claimant appeared in each case), a commission referee, reversing notices of adjusted determination, concluded that the substantial pay reduction gave the claimants good cause to quit their jobs. Reasoning that an ordinarily prudent person would have quit under those circumstances, the referee disqualified neither claimant from receiving compensation. By appropriate orders, the Commission affirmed the referee. Appellant sought review in the Bourbon Circuit Court, which found sufficient evidence in the record to justify the claimants in leaving their jobs thus affirming the Commission.

Diane Tubbs' case comes to this Court in a similar posture with the same supportive reasoning. The claimant had worked for

appellant for two years, grossing $167.60 per week on the plant food spike line, and quitting after she was transferred to the $132 per week tree food spike line. Because she earned less in production bonuses than the claimants in 80–CA–655–MR, the shift would have caused a 21% reduction in her gross pay. This employee, who had worked on the tree food line for one year previously, in addition to some days when other employees were absent, testified before the referee that she would have accepted a temporary transfer to the tree food line. However, she stated that her production manager informed her the change would be permanent. Although appellant's general plant manager, who testified before the referee, believed that the transfer to the tree food line was temporary, he had no knowledge of what the employee's immediate supervisor had told her. The general plant manager emphasized that the tree food spike line, unlike the plant food line, was not conducive to quota work.

The two appeals have been consolidated.

The applicable subsections of KRS 341.-370 provide:

(2) A worker shall be disqualified from receiving benefits for the duration of any period of unemployment with respect to which:

.  .  .  .  .

(c) He has left his most recent suitable work voluntarily without good cause.

Appellant first argues that the work offered the claimants was suitable under the statute, but this is an idle contention for no one denies that position. The crux of the litigation revolves around whether a substantial reduction of income is "good cause" for voluntarily leaving employment when viewed in the light of the test set forth in *Kentucky Unemployment Insurance Commission v. Murphy*, Ky., 539 S.W.2d 293 (1976), to the effect that such a reason "exists only when the worker is faced with circumstances so compelling as to leave no reasonable alternative but loss of employment," and in a voluntary quit case, the burden of proving good cause rests on the employee. *Kentucky Unemployment Insur-*

*ance Commission v. Day*, Ky., 451 S.W.2d 656 (1970).

The pivotal issue of this litigation has yet to be decided by an appellate court of this jurisdiction where there is no element of a collectively bargained agreement. International Spike, relying heavily upon *Murphy, supra*, argues that at every level below the administrative agency and the court reached erroneous conclusions, but it fails to point out why substantial reduction of salary is not good cause within the *Murphy* test. Appellant refers to certain alternatives that were open to the appellees such as continued employment at a lower pay while seeking other employment, but this would foster a practice of consistently reducing wages by varying job assignments without hope of recovering unemployment benefits if we were to accept appellant's arguments.

When looking to foreign jurisdictions, we observe that they have reached opposite results on the question presented here. Denying benefits are Minnesota in *Lewis v. Minneapolis Moline, Inc.*, 288 Minn. 432, 181 N.W.2d 701 (1970), a 7% reduction in wages; Washington in *In re Anderson*, 39 Wash.2d 356, 235 P.2d 303 (1951), a 12% reduction; and Wisconsin in *Roberts v. Chain Belt Company*, 2 Wis.2d 399, 86 N.W.2d 406 (1957), where $71.00 to $95.00 was lowered to $64.00 per week. See also *Pennington v. Dudley*, 10 Ohio St. 90, 226 N.E.2d 738 (1967), a 15% drop in income. On the other hand, California would grant benefits in a 25% wage cut, *Bunny's Waffle Shop v. California Employment Commission*, 24 Cal.2d 735, 151 P.2d 224 (1944), as would Missouri for a 44% reduction, *Armco Steel Corp. v. Labor & Industrial Relations Commission*, 553 S.W.2d 506 (Mo.App.1977), and New Jersey for a 22% decrease, *Johns–Manville Products Corp. v. Board of Review*, 122 N.J.Super. 366, 300 A.2d 572 (1973). However, what appears to be the reconciling factor as between the several jurisdictions is whether the income adjustment is so substantial as to compel an employee to quit a job and still have good cause to do so. As an example, as we pointed out, Minnesota in 1970 denied recovery in *Lewis, supra*, on

a 7% cut while in 1975 allowed benefits in a 25% reduction case. *Scott v. Photo Center, Inc.*, 235 N.W.2d 616 (Minn.1975). Thus, we note the recent trend not only seems to be that a substantial reduction of income is good cause within the unemployment benefits acts to terminate employment by the worker, but also lowering the percentages appears to be the direction the majority is taking. *Unemployment Compensation: Eligibility as Affected by Claimant's Refusal to Work at Reduced Compensation*, 95 A.L. R.3d 449 (1979). *See also* 76 Am.Jur.2d *Unemployment Compensation* § 62, at 961. These principles would have particular applicability at the present inflationary time for our courts have consistently recognized the cost of living factor in various areas from domestic relations matters to the pay of constitutional officers. *Commonwealth v. Hesch*, Ky., 395 S.W.2d 362 (1965).

We are not prepared to adopt a "substantial reduction of salary" rule for this jurisdiction, much less attempt to set forth a mathematical formula defining it. Preference should be given existing doctrines which is the "circumstances so compelling as to leave no reasonable alternative", but to voluntarily quitting work principle last enunciated in *Murphy, supra.* When we recall that the employer failed to appear and inform the commission, as well as this court at oral argument, as to any reason or cause for the employee transfers coupled with a one fourth (21%) to almost one third (32%) salary reductions, then there were certainly "circumstances so compelling as to leave no reasonable alternative" other than for appellees to voluntarily terminate their several employments.

The judgments are affirmed.

All concur.

* The decision was reached prior to Judge Breetz's departure from the Court.