AIRPORT CASINO, INC., a Nevada Corporation, Appellant, *v.* STANLEY P. JONES, Executive Director, State of Nevada Department of Employment; HAROLD KNUDSON, Chairman, Board of Review, Employment Security Department; EMPLOYMENT SECURITY DEPARTMENT; YVONNE NODURFT; FRANCIS KITCHEN; RAYMOND COHEN; JEAN BARTON; YSABEL R. DIAZ; WILLIAM GOTSCHALL; ANATANIA WEIDMANN; AMANDA BURNS; SHIRLEY CAVILL; MONIQUE ENGE; CAROLEE FERNANDEZ; A. NIDIA FERNANDEZ; ISABEL GUIROLA; NICHOLAS GUZMAN; GOMESINDO HERNANDEZ; GLORIA INGRAM; ANNA JUSTICE; ALAN KEARNEY; PAULA KUTY; LORENZO LIMON; PEGGY LYNN; FRED McGOWAN; ELENA MEDINA; ANN MARIE MILLER; SARA MORALES; MARIA MORENO; VIRGINIA NACHTIGALL; FERMIN NUNEZ; EDUARDO PAIS; OSVALDO PAIS; HERBERT REED; JOSEPH SANTANGELO; H. B. SAVAGE; ANTHONY SCAPPETTA; GARYFALIA SMITH; RATKO SODA; JOHN STIBRANY; CONCESA VERONICA STRASSER; DOLORES JONES; RICHARD STANLEY; KIMIE BALLESTEROS; GREGORY BLACKWELL; DORIS LEWIS; RAMON RODRIGUEZ; PENNY STEINMAN; DAWN ANDERSON; ROBERT BARNES; DARLEAN DICKERSON; MILDRED FIET; ROBERT SANDOVAL; MAMMIE OLIVER; JOHN SIMKO; LEA ARENCIBIA; BEVA SALAZAR; LEONORA GARCIA; SANDRA DELGADO; LEON REINALDO; ANSEL COWART; MARIA PEREZ; LYNDA NIEVES; BEVERLY MANGRUM; MARIA ACOSTA; HELEN WASHINGTON; BARBARA BANKS; VERA BELL; MARIA COLMENARES, Respondents.

No. 17150

August 27,1987                                    741 P.2d 814

*Rexon, Freedman, Klepetar & Thomas* and *Fred Griffin*, Los Angeles, California.

*Jones, Jones, Close & Brown*, and *Robert D. Martin*, Las Vegas, for Appellant.

*Crowell, Crowell, Crowell & Susich*, Carson City, for Respondents.

## OPINION

*Per Curiam:*

This is an unemployment compensation case involving the application of the "labor dispute" disqualification provision of NRS 612.395. The basic facts underlying the present controversy are essentially undisputed. The sole legal issue before us is whether claimants were unemployed due to a labor dispute within the meaning of NRS 612.395 and were therefore disqualified from receiving benefits. We conclude that the unemployment was due to a labor dispute in active progress and that the claimants were not entitled to benefits. Accordingly, we reverse the judgment of the lower court and the decision of the Employment Security Department Board of Review.

Appellant Airport Casino, Inc. is a Nevada Corporation doing business as the Marina Hotel ("Marina") in Las Vegas, Nevada. Marina is an employer subject to Chapter 612, Unemployment Compensation Law, of the Nevada Revised Statutes. The claimants involved were members of the Culinary Workers Local 226, Bartenders Local 165, and Stagehands Local 720; all were

employed by the Marina Hotel. The majority of the claimants, however, were members of the Culinary Workers Local 226. The unemployment involved in this litigation arose out of the following situation.

Marina had a three-year collective-bargaining agreement with Culinary Local that was to expire on April 1, 1984. On January 26, 1984, Marina's executive vice president and chief operating officer sent a letter to the Culinary Union stating that Marina was willing to begin new contract negotiations. On February 3, 1984, because of ongoing financial problems and major upcoming expenses in connection with conforming to newly adopted fire codes, Marina filed a voluntary petition in bankruptcy for reorganization under Chapter 11 of the Bankruptcy Code. Marina informed the Culinary Union that it had filed the petition on February 28, 1984. On March 9 and again on March 22, Marina and the Culinary Union met to consider proposals submitted by Marina; on March 26, members of the Culinary Union rejected Marina's proposal.

The following day, Tuesday, March 27, 1984, Marina requested permission from the bankruptcy court, pursuant to 11 U.S.C. § 365(a), to reject its collective-bargaining agreement with the Culinary Union. The bankruptcy court did not allow Marina to reject its collective-bargaining agreement at that time, but rather asked Marina and the Culinary Union to meet another time and try to negotiate an agreement. No negotiations were held. However, on March 29, 1984, Marina returned to the bankruptcy court and renewed its request to reject its collective-bargaining agreement. The court found that the modification of the Culinary Union contract alone could supply Marina with an additional $75,000 per month that it needed to comply with the new fire code. The court announced from the bench that the Culinary Union contract represented a burden to Marina's reorganization efforts and permitted Marina to reject its collective-bargaining agreement with the employees of the Culinary and Bartenders Unions. Representatives of the union and union members were present in the court room when the bankruptcy court made its decision. However, the written order of the court, rejecting the collective-bargaining agreement in its entirety, was not signed until April 2, 1984.

On the following day, Friday, March 30, 1984, Marina's executive vice president and chief operating officer hand delivered a letter to the president of the Local Joint Executive Board of the Culinary and Bartenders Unions. The letter informed the unions that pursuant to the March 29, 1984 authorization of the bankruptcy court to reject their collective-bargaining agreement,

Marina was instituting new terms and conditions of employment that would become effective at 7:00 a.m., Sunday, April 1, 1984. Included in the newly instituted changes were a 10 percent reduction in wages, elimination of pension payments, elimination of three holidays, and reduction to one meal per eight hours of work. Marina stated that it would continue to contribute to the union health insurance program but that any increase in contributions would have to be paid by employees or into a company program. Marina additionally stated that it stood ready to continue to bargain with the union at a mutually agreeable date and time.

At 1:00 p.m. on March 30, 1984, the same day that Marina's letter was hand delivered to the union, there was a mass walkout by all the culinary, bartenders, and stagehand employees. Picket lines were set up in front of the Marina.

Following the walkout, numerous former employees applied for unemployment benefits with the Employment Security Department. All claims for benefits were filed on or after April 9, 1984. One group of approximately 47 claimants, who had initially been found ineligible because of their involvement in a labor dispute, appealed that determination to a senior appeals referee. That referee affirmed the original determination that the employees were ineligible for benefits because their unemployment was due to a labor dispute in progress at the Marina. The 47 claimants then appealed the decision to the Board of Review, which reversed the decision of the referee and found that the claimants were not disqualified under the labor dispute provision. Marina then filed its petition for judicial review of the Board's decision. The Board of Review also found two other groups of Marina employees eligible for benefits and Marina sought judicial review of these decisions as well. Following a hearing of Marina's consolidated petitions for judicial review, the district court found that the claimants had not been involved in a labor dispute and were entitled to unemployment benefits. The court issued its order denying the relief sought in Marina's petition and affirmed the decision of the Employment Security Department Board of Review. This appeal followed.

We begin our consideration of this issue by emphasizing that the legislative intent of unemployment compensation statutes is to provide temporary assistance and a measure of economic security for individuals who become involuntarily unemployed. In the instant matter, we are asked to construe NRS 612.395, the labor dispute disqualification provision for unemployment benefits, which provides in pertinent part: "An individual shall be disqualified for benefits for any week with respect to which the executive director finds that his total or partial unemployment is due to a

labor dispute in active progress at the factory, establishment or other premises at which he is or was last employed.'' The positions of the parties are clearly set forth. Marina contends that employees who go on strike because their employer has been authorized by a bankruptcy court to change the terms of their collective bargaining agreement are engaged in a labor dispute within the meaning of NRS 612.395. Conversely, the claimants maintain that Marina's unilateral reduction of salaries and benefits was substantial enough to constitute a termination. Further, the claimants argue that their unemployment was not ''due'' to a labor dispute but was rather ''due'' to Marina's bankruptcy and the changes it instituted. We reject the claimant's arguments for the reasons stated below.

We initially note that the term ''labor dispute,'' although not defined in the Unemployment Compensation Act, includes ''any controversy concerning wages, hours, working conditions, or terms of employment.'' *See* Gorecki v. State, 335 A.2d 647 (N.H. 1975); Be-Mac Transport Company, Inc. v. Grabiec, 314 N.E.2d 242 (Ill.App. 1974); Smith v. Michigan Employment Sec. Commission, 301 N.W.2d 285 (Mich. 1981). This definition is reflected in the language of NRS 614.010[1] (which provides that the governor shall attempt to settle labor disputes amicably) and is essentially the same as the definitions used in the Norris-La Guardia Act and the National Labor Relations Act[2].

In determining whether the claimants unemployment is ''due to a labor dispute,'' we find Briggs Transportation Co. v. Intern.

---

[1]NRS 614.010(1) provides in pertinent part:

Whenever a controversy concerning wages, hours of labor, or conditions of employment shall arise between an employer and his employees, seriously interrupting or threatening to interrupt the business of the employer, the governor shall, upon the request of either party to the controversy, with all practicable expedition, put himself in communication with the parties to such controversy. . . .

[2]29 USCS § 113(c) provides:

The term ''labor dispute'' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 USCS § 152(9) provides:

The term ''labor dispute'' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.

Broth. of Teamsters, 116 LRRM 2241 (D.C.Minn. 1984) to be highly instructive. There, the employer Briggs filed a Chapter 11 petition under the Bankruptcy Code. After failing to arrive at an agreeable reduction in contract benefits with the unions, the bankruptcy court entered an order approving Briggs' rejection of its collective-bargaining agreements. Briggs immediately announced a unilateral reduction in wages from $13.21 an hour to $9.00 an hour as well as significant cuts in fringe benefits and changes in important terms of employment. Employee members of the Teamsters Union began a strike and stationed pickets at many of Briggs' terminals. In response, Briggs agreed to postpone the effective date of the proposed changes; the parties conducted further meetings but failed to arrive at a negotiated solution. Briggs then filed an action in federal court seeking an injunction preventing the Teamsters from engaging in strike-related activities. In denying Briggs' request for a preliminary injunction to bar disruptive picketing activity, the court specifically found that the controversy was a "labor dispute" stating:

> The very basis of the present action is Briggs' fear that the defendant unions will engage in unlawful picketing activities after Briggs institutes its reduced wage schedule in conformity with the Bankruptcy Court's order authorizing a reduction in wages. *Nothing could be more central to the employer-employee relationship than the wages and fringe benefits employees will receive for their services. Thus this court believes that the dispute between Briggs and its union arises out of a labor dispute within the meaning of the Norris La-Guardia Act.* (Emphasis added.) *Id.* at 2243.

In affirming the district court's refusal to enjoin Briggs' employees from picketing, the Eighth Circuit Court reiterated that Briggs' employees were involved in a "labor dispute" by noting that "any Briggs employees who strike out of dissatisfaction with Briggs' wages, benefits, and terms of employment may be considered economic strikers. . . ." Briggs Transp. Co. v. Intern. Broth. of Teamsters, 739 F.2d 341, 344 (8th Cir. 1984), *cert. denied,* 105 S.Ct. 295 (1984).

While *Briggs* does not deal with a "labor dispute" within the meaning of the unemployment compensation statutes, the court's reasoning is directly applicable to the case at bar. Here, Marina obtained approval from the bankruptcy court to reject its collective-bargaining agreement. When Marina announced its changes the following day, members of the union walked off the job and set up picket lines. They did not wish to accept the abrogation of their contract and they had failed to negotiate a new agreement. As in *Briggs,* the employees were expressing their

dissatisfaction with wages, benefits and terms of employment. Quite clearly the employees were economic strikers engaged in a labor dispute. In fact, in a number of jurisdictions, a strike itself constitutes a labor dispute so as to disqualify employees from recovering unemployment compensation. Cameron v. De Board, 370 P.2d 709 (Ore. 1962); American Steel Foundries v. Gordon, 88 N.E.2d 465 (Ill. 1949). Moreover, it makes no difference that the strike occurred after Marina was allowed to reject the collective-bargaining agreement. The common meaning and ordinary sense of the term "labor dispute" includes strikes whether during the term of a collective-bargaining agreement or after its expiration. Barbour v. D. C. Dept. of Employment Services, 499 A.2d 122, 125 (D.C.App. 1985).

Respondents maintain, however, that Marina's reduction of salaries and benefits was substantial enough to constitute a termination of the employees and a consequent substandard offer to rehire. See NRS 612.390(3)(b). To support this contention, respondents draw this court's attention to a number of cases including International Spike, Inc. v. Ky. Unemployment Ins., 609 S.W.2d 374 (Ky.App. 1980) which stand for the proposition that a substantial reduction of income is good cause within the unemployment benefits acts to terminate employment by the worker. Such cases are simply inapposite given the facts of the instant case. Here, the claimants did not actually quit their jobs, as did the workers in *International Spike,* but rather they chose to go on strike. Based on our ruling in Landis v. American Potash, 78 Nev. 424, 375 P.2d 402 (1962) that the employer-employee relationship is a status which is not destroyed by a strike, we cannot accept respondents' contention that Marina's reduction of salaries and benefits amounted to a termination in this case. Respondents contend that the employees had been terminated, but fail to satisfactorily explain to this court why these "terminated" employees were striking their employer.

In Sandoval v. Industrial Commission, 130 P.2d 930, 935 (Colo. 1942) the Colorado Supreme Court stated that a strike possesses at least four elements other than a suspended employer-employee relationship: (1) A demand for some concession, generally for a modification of conditions of labor or rates of pay; (2) a refusal to work, with intent to bring about compliance with the demand; (3) an intention to return to work when compliance is accomplished; and (4) an intention on the part of the operator to re-employ the same men or men of a similar class when the demands are acceded to or withdrawn, or otherwise adjusted.

Here, Marina and the unions had been actively negotiating a new contract. In fact, in Marina's March 30, 1984 letter informing the unions of its unilateral reductions, Marina stated that it stood ready to continue to bargain with the union at a mutually agreeable date and time. Under these circumstances, we conclude that the employees were striking to protest the modifications but with the intention of returning to work under more agreeable wages and terms of employment. We reject the notion that the present controversy arises out of a bankruptcy proceeding and therefore is not a labor dispute. This is precisely the kind of activity which constitutes a labor dispute—a controversy concerning wages, hours, working conditions, and terms of employment. Moreover, because we recognize this state's policy of maintaining strict neutrality in cases of industrial strife, we find it unnecessary to place blame or decide which party was at fault. Depaoli v. Ernst, 73 Nev. 79, 309 P.2d 363 (1957). We hold that the claimant's unemployment was due to a labor dispute within the meaning of NRS 612.395.

Judgment of the lower court and the decision of the Employment Security Department Board of Review are reversed.