EVELYN KITCHEN AND OTHERS v.
G. R. HERBERGER'S, INC.

114 N. W. (2d) 64.

March 9, 1962—No. 38,328.

*Gannon & Dahle,* for relator.

*Walter F. Mondale,* Attorney General, and *Joseph A. Coduti,* Assistant Attorney General, for respondent commissioner.

*Sigal, Savelkoul & Cohen,* for respondent claimants.

MURPHY, JUSTICE.

This matter is before us on certiorari to review a decision of the commissioner of the Department of Employment Security. The claimants are former employees of G. R. Herberger's, Inc., a department store formerly located in Hibbing, Minnesota. The appeal seeks to reverse the decision of the commissioner awarding unemployment compensation to the claimants. The employer asserts that they were disqualified from recovery within the provisions of Minn. St. 268.09, subd. 1(6), because their employment has not been discontinued or that they "voluntarily discontinued" their employment within the meaning of § 268.09, subd. 1(1).

From the record it appears that the employer had been engaged in the operation of a department store in Hibbing since 1943. It also operates stores in other cities in Minnesota, Wisconsin, and South Dakota. The employees of the Hibbing store were members of the United Retail, Wholesale, and Department Store Employees of America since 1952 or 1953. In the spring of 1960 all of the union employees, approximately 43, delegated their bargaining rights to 4 representatives. At this time there were 64 employees on the employer's Hibbing payroll. The employees worked under a labor contract which was to expire May 15, 1960. Negotiations for a future 3-year contract began April 27, 1960. The contract under which they were employed provided for a progressive increase in hourly wages from $1.095 to $1.21 in the case of senior sales people. The claimants' original demand was for an increase of 75¢ per hour, spread over 3 years. The employer offered 19¢. Negotiations continued off and on until a final meeting was held on June 23, at which time the employer offered to pay 24¢ over a 3-year period. The claimants, however, held out for a 30¢ increase over the 3-year period.

Although the contract expired on May 15, 1960, the employees continued to work under its provisions during part of the time negotiations were being carried on. On June 3, however, they went out on strike

and commenced picketing the employer's establishment. Following the commencement of picketing, the employer incurred substantial losses due to a decline in patronage. On June 30 it published an announcement that it would close retail operations in about a month because of union difficulty. Immediately following this announcement, two employees requested and were given work packing goods for moving and selling goods. During the first week of July 1960 two other employees requested work but were denied employment. During the month of July the employer liquidated its inventory by sale of goods at reduced prices and by shipping the remainder of its stock to other stores. On July 30, 1960, the employer placed an advertisement in a Hibbing newspaper informing the public that it was discontinuing business. The public was informed that for the convenience of customers an employee would remain on the premises to receive payments on charge accounts and for delivery of lay-bys. The public was further informed that the other occupants of the premises "ALL ARE INDEPENDENT BUSINESSES AND ARE UNDER SEPARATE LEASE"; and that "[a]ll our merchandise is gone. It has either been sold or shipped to our other stores. No more merchandise will be sold in the Hibbing store"; and that the company was "LEAVING ON SCHEDULE."

The employees who had been picketing the establishment found the store closed on August 1, 1960, and withdrew the picket lines. On the same day most of the employees who were not rehired filed claims for unemployment compensation for the period commencing on that date. The claims deputy determined that the employees were eligible for unemployment compensation; and the employer on August 25, 1960, filed an appeal and objection with the Department of Employment Security asserting that the unemployment was brought on voluntarily by the claimants' striking, as a result of which the financial loss to the employer "forced it to quit business." The holding of the claims deputy was affirmed by the appeal tribunal of the department and by the commissioner.

■ The employer directs the court's attention to § 268.09, subd. 1(6), which provides that an individual shall be disqualified for benefits:

"If such individual has left or partially or totally lost his employment with an employer because of a strike or other labor dispute. Such disqualification shall prevail for each week during which such strike or other labor dispute is in progress at the establishment at which he is or was employed * * *."

The employer claims that the disqualification for benefits expressed in the foregoing provision applies to the claimants here because, as the employer expresses it, the employment of the claimants "has not been discontinued but rather has only been suspended." It reasons that since no formal settlement of the dispute has been arrived at the labor dispute is still in progress and that the claimants' disqualification continues. We have carefully examined the authorities cited in support of this argument.[1] It may be said that the purpose of § 268.09, subd. 1(6), is to preserve the status quo of the parties during the course of a labor dispute so that at its cessation they will stand in the same relation to each other as at the beginning so far as payment of benefits under the act is concerned. The legislative policy underlying this statute protects employers against having to finance a strike against themselves, as would be the case if their accounts were charged for payment of unemployment compensation benefits to their employees during the progress of a labor dispute. The employer receives the full benefit of the protection of this provision during the progress of the labor dispute, so long as it does not take affirmative action to end the claimant's status as an employee. As the Wisconsin court in Marathon Elec. Mfg. Corp. v. Industrial Comm. 269 Wis. 394, 408, 69 N. W. (2d) 573, 581, said:

"* * * If it does elect to terminate such status during the progress of the labor dispute the reason for the affording of such protection disappears."

We do not think it can be fairly said that the disqualification for benefits existed after July 30. There was then no longer a "strike or

---

[1]Hessler v. American Television & Radio Co. 258 Minn. 541, 104 N. W. (2d) 876; Little Rock Furniture Mfg. Co. v. Commr. of Labor, 227 Ark. 288, 298 S. W. (2d) 56.

other labor dispute in progress at the establishment" where the claimants were employed.

Ordinarily a strike is ended by agreement between the parties and the return of strikers to work. But a strike or labor dispute may be terminated in other ways. In Ayers v. Nichols, 244 Minn. 375, 70 N. W. (2d) 296, the strike was ended when the employer was able to resume productive operations by the return of some of the strikers and by filling out the balance of the work force by hiring permanent replacements for the remaining strikers. In the case before us the dispute was ended when the employer determined to go out of business. After this decision there were no jobs over which there could be a dispute and nothing was left to negotiate. Under the facts before us it is not realistic to say that the employment was suspended. The employer-employee relationship was terminated when the employer went out of business. This decision was made by the employer. In face of the actualities of the situation, it cannot now be reasonably said that there is still a dispute in progress. See, Great A. & P. Tea Co. v. Div. of Unemployment Comp. 29 N. J. Super. 26, 101 A. (2d) 573.

■ The employer next directs attention to § 268.09, subd. 1(1), which provides for disqualification for benefits—

"If such individual voluntarily and without good cause attributable to the employer discontinued his employment with such employer * * *."

It is argued that the claimants, by engaging in a strike or labor dispute, "voluntarily discontinued" their employment and consequently disqualified themselves for benefits under § 268.09, subd. 1(1). This point was considered and resolved adversely to the employer's contention in Ayers v. Nichols, *supra,* which authority is controlling here. The Ayers case involved a labor dispute which occurred after unsuccessful bargaining followed by a strike in which all but 10 of 299 employees first participated. The employer continued to operate his plant during the dispute. About half of the strikers returned and the employer recruited new employees as permanent replacements for those remaining on strike, completing his personnel requirements. In an effort to get their jobs back, the strikers agreed to submit the issue of their re-

employment to arbitration. The arbitrator, acting under provisions of the National Labor Relations Act, determined that the strikers had been permanently replaced by the employer and that they had no right to reinstatement. Thereafter the unemployed persons filed for unemployment benefits. We held that the claimants were entitled to such benefits inasmuch as the labor dispute had ended. It is definitely determined in that decision that the act of leaving employment for the purpose of engaging in a strike or labor dispute does not necessarily result in forfeiture by the employee of unemployment compensation benefits beyond the period (§ 268.09, subd. 1[6]) "such strike or other labor dispute is in progress at the establishment" at which the claimant had employment. We pointed out there that the striking employee retains his status, and in contemplation of law remains an employee, even though he removes himself from actual labor. We there said (244 Minn. 380, 70 N. W. [2d] 299):

"The general concept of a strike is that employees who go out on strike do not quit their employment, but ordinarily the relationship of employer and employee continues until one or the other of the parties acts to sever the relationship or they mutually act to accomplish that purpose."

We held in the Ayers case that (244 Minn. 382, 70 N. W. [2d] 300) "the act of the employer in refusing to take [the claimants] back * * * ultimately created the unemployment. Voluntary unemployment must be held to require some act of the employee at least acquiescing in the unemployment."[2] By the same token the act which ultimately created the unemployment here was the decision of the employer to go out of business.

It is established under our decisions that the benefits of unemployment compensation are extended and confined to those who are unemployed through no fault of their own. Bucko v. J. F. Quest Foundry Co. 229 Minn. 131, 38 N. W. (2d) 223. In that case we refused to look

---

[2]See, also, Melchick Unemployment Comp. Case, 396 Pa. 560, 154 A. (2d) 875, where the claimants who had gone on strike sought to but could not return to work because of a decrease in the work at the plant.

behind the act of closing the plants to ascertain the actual cause. We there said (229 Minn. 143, 38 N. W. [2d] 231):

"* * * the *fault* which governs is the ultimate and final act causing the unemployment rather than any preliminary act which might furnish a motive * * * causing the unemployment."

The authorities relied upon by the employer may be distinguished. In Johnson v. LaGrange Shoe Corp. 244 Minn. 354, 70 N. W. (2d) 335, the union and the employer had entered into a collective bargaining agreement which contained provisions relating to vacations. The issue turned on the eligibility for unemployment compensation of certain claimants who did not qualify for vacation pay. The court based its decision on the language of the collective bargaining agreement and the actions of the employees taken pursuant to the agreement, all of which can be said to be voluntary acts. See, also, Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 47 N. W. (2d) 449. In Anson v. Fisher Amusement Corp. 254 Minn. 93, 93 N. W. (2d) 815, the decision turned upon the provisions of a collective bargaining agreement. The claimant in that case was separated from employment in order to make room for another employee pursuant to union seniority rules. The claimant's status was subject to the provisions of the collective bargaining agreement, and it was held under the circumstances the acts of the bargaining agent were the employee's acts and his resignation was voluntary within the meaning of § 268.09, subd. 1(1). Here again the court found that the volitional act which gave rise to the employee's disqualification was found in the terms of the collective bargaining agreement which governed the employer-employee relationship. See, also, Bergseth v. Zinsmaster Baking Co. 252 Minn. 63, 89 N. W. (2d) 172. In the case before us there was no agreement in existence pursuant to which it can be said that the resulting unemployment came from the claimants' voluntary act or with their consent.

Affirmed.

MR. JUSTICE ROGOSHESKE, not being a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.