**GEO. A. HORMEL &
COMPANY, Relator,**

v.

**Myron ASPER, et al., and Commissioner
of Jobs and Training, Respondents.**

**Nos. C4–87–929, C8–87–965.**

Court of Appeals of Minnesota.

Nov. 24, 1987.

Timothy G. Costello, Sheryl L. Kuhary, Milwaukee, Wis., James W. Cavanaugh, Austin, for Geo. A. Hormel & Co., relator.

David S. Anderson, Minneapolis, for Myron Asper, respondent.

Hubert H. Humphrey, III, Atty. Gen., Donald E. Notvik, Sp. Asst. Atty. Gen., St. Paul, for Com'r of Jobs and Training, respondent.

Heard, considered and decided by NORTON, P.J., and MULALLY and LOMMEN, JJ.*

## OPINION

A. PAUL LOMMEN, Judge.

Relator George A. Hormel and respondents, approximately 600 claimants for un-

---

* Acting as judge of the Court of Appeals by ap-          pointment pursuant to Minn. Const. art. 6, § 2.

employment compensation, seek review of a decision by the Commissioner of Jobs and Training that respondents filed valid claims for benefits immediately after a strike began at Hormel's Austin, Minnesota plant on August 17, 1985; that the strike ceased active progress on May 23, 1986, when the trustee for respondents' local union sent Hormel an unconditional offer to return to work on behalf of all striking employees; that employees who made individual offers to return to work before the labor dispute ended nevertheless remained disqualified for benefits; and that evidence regarding attempts to form another union was immaterial to this action. We reverse the Commissioner's determination that the strike ceased active progress on May 23, and affirm on all other issues.

### FACTS

Relator George A. Hormel and Company ("Hormel") is engaged in the meat packing business. All of the respondents were production or maintenance workers employed at Hormel's slaughtering and packing facility in Austin, Minnesota.

On August 17, 1985, respondents commenced a strike against Hormel. The strike was sanctioned and authorized by the United Food and Commercial Workers International Union (UFCW), the parent organization of respondents' union, Local P-9. Following the work stoppage, respondents immediately filed unemployment compensation claims. The Commissioner of Jobs and Training subsequently determined respondents were engaged in a strike, rather than a lock-out, and were disqualified for each week the strike was in progress. At that time, Hormel did not raise the issue of the validity of respondents' claims.

On January 4, 1986, Hormel sent a letter to respondents, stating the Austin plant would be reopened on January 13, and asking respondents to return to work. When respondents refused to return, Hormel engaged replacement workers.

After the positions at Hormel were filled, several respondents made unconditional offers to return to work. When Hormel was unable to accept the offers, those respondents renewed their requests for unemployment compensation benefits, but the Department of Jobs and Training denied the requests, reasoning the strike was still in progress.

On March 13, 1986, UFCW withdrew its sanction of the strike, and ordered Local P-9 to cease the strike and tender an offer to return to work on behalf of all of the remaining strikers. Local P-9 did not comply with this directive, and continued the strike. Consequently, on May 7, 1986, UFCW placed Local P-9 in trusteeship.

On May 23, 1986, Local P-9's appointed trustee sent a letter to Hormel making an unconditional offer to return to work on behalf of the striking employees. Nevertheless, the picketing at the Austin plant continued, and the trustee was forced to seek a court order confirming the trusteeship. On June 2, 1986, the district court issued its order confirming the trusteeship, and on June 4, the picketing at the Austin plant ceased.

On July 2, 1986, the North American Meatpackers Union (NAMPU), filed a petition with the National Labor Relations Board, seeking to obtain representation of the Local P-9 workers. Apparently, some of the Local P-9 members were involved in this attempt to obtain alternate representation.

On August 28, 1986, Hormel and Local P-9 reached a tentative four-year collective bargaining agreement, and on September 12, 1986, the members of Local P-9 ratified the agreement in a mail referendum.

On September 23, 1986, a referee from the Department of Jobs and Training conducted a hearing to determine respondents' entitlement to unemployment compensation benefits. At the hearing, respondents attempted to prove: (1) their claims filed in 1985 when the strike began were valid; (2) the individual respondents who offered to return to work before the strike ended should be entitled to receive benefits based upon those offers; and (3) the strike ended on May 23, 1986 when the trustee declared

the strike over and offered to return all striking employees to work.

Hormel, on the other hand, attempted to prove: (1) respondents' claims for unemployment compensation benefits filed at the commencement of the strike were not valid; (2) the labor dispute continued beyond the date of the trustee's offer; and (3) the individual strikers who tendered offers to return prior to the end of the strike remained disqualified from receiving benefits until the labor dispute ended.

Following the hearing, Hormel moved to reopen the record to obtain additional evidence regarding NAMPU. Hormel claimed this new information would demonstrate the labor dispute continued past May 23.

On December 11, 1986, the referee issued his decision determining: (1) respondents' August 1985 claims for unemployment compensation benefits were valid; (2) the strike ended on May 23, 1986 with the trustee's unconditional offer to return respondents to work; (3) respondents who made individual offers to return to work before the strike ended remained disqualified from receiving benefits until the strike ended because they were still members of the striking union; and (4) it was unnecessary to reopen the hearing for additional evidence regarding NAMPU because Local P–9, and not NAMPU, was respondents' legal bargaining unit, and the referee did not consider the organization of NAMPU to be material to the strike.

Both Hormel and the respondents appealed to a Commissioner's representative, who determined: (1) respondents were unemployed after the strike began; thus, their claims for benefits were valid; (2) the strike ceased "active progress" on May 23, 1986; (3) the strikers who made individual attempts to return to Hormel before the strike ended remained disqualified from receiving benefits because they were directly interested in the strike; and (4) the new evidence regarding NAMPU requested by Hormel was irrelevant because the UFCW trustee was the valid representative of the workers.

Hormel and respondents appealed from the Commissioner's decision, and the two appeals were consolidated by order of this court dated June 1, 1987.

## ISSUES

1. Did respondents file valid claims for unemployment compensation benefits immediately after the strike began in August 1985?

2. Did the labor dispute cease active progress on May 23, 1986?

3. Did the Commissioner properly determine that those respondents who tendered individual offers to return to work before the strike ended remained disqualified from receiving unemployment compensation benefits until the strike ended?

4. Did the Commissioner err by denying Hormel's request to reopen the record?

## ANALYSIS

In proceedings of this nature, our scope of review is limited to determining whether the department kept within its jurisdiction; whether it proceeded on an erroneous theory of law; whether its action was so arbitrary and unreasonable that it represented its will and not its judgment; or whether its decision is without evidence to support it. *Johnson v. Wilson & Co.*, 266 Minn. 500, 507, 124 N.W.2d 496, 501 (1963).

Minn.Stat. § 268.09, subd. 3 (1984) provides in part:

> An individual who has left or partially or totally lost employment with an employer because of a strike or other labor dispute at the establishment in which the individual is or was employed shall be disqualified for benefits:
>
> (a) For each week during which the strike or labor dispute is in progress;
> * * *.

*Id.*

### 1. *1985 Claims*

■ Respondents filed claims for unemployment compensation benefits immediately after the strike began on August 17, 1985. Hormel claims the Commissioner erred by finding these August 1985 claims valid. We believe the issue of validity is inappropriately raised at this time, because

after the respondents filed their initial claims for benefits in August 1985, the Commissioner thereafter determined respondents were engaged in a strike, and were disqualified from receiving benefits until the strike ended. Hormel did not at that time litigate or appeal the issue whether respondents' claims for benefits were valid.

Minn.Stat. § 268.10, subd. 2 (1984) provides:

> An official, designated by the commissioner, shall promptly examine each claim for benefits * * * and, on the basis of the facts found, shall determine whether or not such claims are valid * * *. If * * * the employer makes an allegation of disqualification * * * if the claim is valid, the issue thereby raised shall be promptly determined * * *.

*Id.* This language indicates that, because the issue of disqualification was determined, respondents' claims must have been considered valid. Hormel in 1985 had the opportunity to litigate and appeal the issue of validity; thus, we believe the first decision constitutes the law of the case. Nevertheless, we will address the merits of Hormel's argument that the 1985 claims were not valid.

■ Hormel cites *Kalin v. Oliver Mining Co.*, 228 Minn. 328, 37 N.W.2d 365 (1949) as dispositive. There, an employee who was reaching retirement age attempted to file for unemployment compensation benefits to freeze his wage credits, and the court ruled the claim was not valid. *Id.* at 334, 37 N.W.2d at 368. We find *Kalin* distinguishable on its facts. While the employee in *Kalin* was not "unemployed" at the time of filing, here, after the strike began, respondents were unemployed. An individual who is unemployed may file a claim for unemployment compensation benefits. Although the legislature proscribed payment of benefits during a strike, there is no statutory proscription against the filing of a claim during that time.

Hormel also argues respondents' 1985 claims were not valid because Minn.Stat. § 268.04, subd. 24 (1984) defines a "valid claim" as one "filed by an individual who

has registered for work * * *." *Id.* Hormel claims it would be inconsistent to find respondents registered for work when they were withholding their services due to a strike. We agree with the Commissioner's response to Hormel's argument: at least some of the striking workers did actually seek other work during the strike. In fact, during oral argument, counsel for Hormel admitted that at least several hundred respondents did register for work.

Finally, Hormel argues that to find the the August 1985 claims valid "contravenes both legislative and judicial mandates reserving unemployment benefits to those unemployed through no fault of their own." In support of this argument, Hormel cites *Kitchen v. G.R. Herberger's, Inc.*, 262 Minn. 135, 114 N.W.2d 64 (1962) where the court stated:

> It may be said that the purpose of [the labor dispute provision within the unemployment compensation statutes], is to preserve the status quo of the parties during the course of a labor dispute so that at its cessation they will stand in the same relation to each other as at the beginning so far as payment of benefits under the act is concerned. The legislative policy underlying this statute protects employers against having to finance a strike against themselves, as would be the case if their accounts were charged for payment of unemployment compensation benefits to their employees during the progress of a labor dispute.

*Id.* at 138, 114 N.W.2d at 66. Hormel concludes that to allow striking employees to, in effect, freeze their base periods at the commencement of a strike simply delays the period in which an employer must finance a strike against itself.

We cannot agree. Allowing respondents to freeze their base periods in fact preserved the status quo of respondents and Hormel during the course of their labor dispute, "so that at its cessation they * * * stand in the same relation to each other as at the beginning * * *." *Id.*

### 2. *Cessation of Labor Dispute*

Minn.Stat. § 268.09, subd. 3(a) provides that an individual who has lost his employ-

ment because of a strike or other labor dispute is disqualified from receiving unemployment compensation benefits each week "during which the strike *or labor dispute* is in progress * * *." *Id.* (emphasis supplied). Here, the Commissioner determined the strike ceased to be in active progress on May 23, 1986, when the trustee, on behalf of the striking employees, made an unconditional offer to return to work. Hormel claims this determination is erroneous because the underlying labor dispute continued in active progress beyond May 23, 1986; thus, the employees' disqualification from unemployment compensation benefits also continued. Hormel points to the following definition of "strike" in the Minnesota Labor Relations Act:

"Strike" means the temporary stoppage of work by the concerted action of two or more employees as *a result of a labor dispute.*

Minn.Stat. § 179.01(8) (1984) (emphasis supplied). In addition, Hormel notes that within the Minnesota unemployment compensation statutes, the legislature distinguishes between "strike or labor dispute."

We find the case of *Johnson v. Wilson & Co.*, 266 Minn. 500, 124 N.W.2d 496 (1963) controlling. In *Johnson,* a strike had begun on November 3, 1959, and on or about November 30, the employer began hiring new employees to operate its plant. In December and January a series of negotiations were held, but no agreement was reached. On February 12, 1960, the employer and union representatives agreed to submit disputed matters to an arbitration board; on February 16, a new collective bargaining agreement was entered into by the employer and union representatives, subject to ratification by the union members; and on February 19, 1960, the union membership ratified the agreement.

The *Johnson* court distinguished between the type of statute which denies unemployment compensation benefits during the "active progress" of a labor dispute, and the "work stoppage" type of statute, where denial of benefits runs simultaneously with substantial curtailment of work at the employer's establishment. The *Johnson* court indicated Minnesota's statute is the "active progress" type, and affirmed the Commissioner's determination that the strike and labor dispute ceased active progress on February 19, when the union membership ratified the agreement.

Application of the *Johnson* decision to the present situation requires a finding that the labor dispute between respondents and Hormel ceased "active progress" when the Local P–9 workers ratified the new collective bargaining agreement on September 12, 1986.

The Commissioner stated:

While the claimants may well have sought negotiations subsequent to May 23, 1986, at that time the claimants were willing to accept the wages and working conditions which the employer would make available. The strike (labor dispute) ceased being in "active progress" on May 23, 1986.

In finding Local P–9's labor dispute ceased active progress on May 23, 1986, the Commissioner relied upon the fact that the trustee at that time offered to return the striking employees to work.

We find this reasoning erroneous. While undoubtedly the trustee had the authority to make an offer to return to work on behalf of the striking employees, the strike by respondents actually continued until June 4, when the picketing ceased. And even when the "strike" stopped, the underlying labor dispute over the terms and conditions of employment continued. No true resolution of that dispute occurred until a new collective bargaining agreement was reached on September 12. Contrary to respondents' argument, the trustee's offer on May 23 did not evidence a belief that the controversy had been completely settled; only, that the strike would cease. In fact, the trustees' letter to Hormel stated:

This is to advise you that UFCW Local P–9's *strike* against the Hormel Company is hereby terminated and I hereby make an unconditional offer to return to work on behalf all striking employees of Hormel in Austin, Minnesota.

In addition, you have received previous communications from me *demanding that you contact me for purposes of setting up a bargaining session for the purpose of attempting to reach a collective bargaining agreement. This is to renew that demand* and to further advise you that Local P–9's challenge to the trusteeship which had previously been filed in the United State District Court for the District of Columbia has now been transferred to the United States District Court for the District of Minnesota and, consequently, it is our position that *there is no impediment to your bargaining with me as the representative of Local P–9.*

(Emphasis supplied.) The trustee's letter itself demonstrates even though the strike ceased, the underlying labor dispute continued.[1]

■ The parties' debate as to whether or not the strikers would or would not have actually returned to work following the trustees offer does not determine whether or not the labor dispute continued. Employees need not continue a strike for a labor dispute to actively continue.

The *Johnson* decision determined a labor dispute ceased active progress when the union membership ratified the new agreement. Likewise, here, we conclude respondents' labor dispute ceased active progress on September 12, when respondents ratified a new collective bargaining agreement.

Hormel claims the labor dispute continued even past the September 12 date, noting that all of the outstanding issues in the dispute had not been resolved at that time.

In *Johnson*, the union and employer ratified an agreement on February 19, even though the final terms regarding reemployment of the striking workers had not been reached. Nevertheless, the *Johnson* court affirmed the Commissioner's determination that on February 19, the labor dispute ended. Again, relying on *Johnson*, we find respondents' labor dispute ceased active progress on September 12, when the mem-

bers of Local P–9 ratified a new collective bargaining agreement with Hormel.

■ Hormel also argues labor disputes between Local P–9 and UFCW, and UFCW and NAMPU continued past May 23; thus, respondents' disqualification should have continued until that labor dispute was resolved. Indeed, the term "labor dispute" includes a jurisdictional controversy between labor organizations. Minn.Stat. § 268.09, subd. 3(b).

The legislature has provided, however, that an individual is disqualified from receiving unemployment benefits if he left or lost his employment *"because of* a strike or other labor dispute * * *."* Minn.Stat. § 268.09, subd. 3 (emphasis supplied). Here, respondents lost their employment because of the strike and underlying labor dispute involving terms and conditions of employment, and not the dispute between Local P–9 and UFCW, or the alleged interunion fight between UFCW and NAMPU. In fact, the controversy between Local P–9 and UFCW did not appear to manifest itself until March 1986, when the Local refused to comply with UFCW's order to stop the strike, and there is no evidence the alleged controversy regarding NAMPU began until July 1986. The Commissioner, therefore, correctly focused upon the question of when respondents' strike and labor dispute over the terms of employment ended, since that labor dispute (and resultant strike) was the reason respondents left their employment with Hormel.

In *Johnson*, the Minnesota Supreme Court addressed a similar issue. There, the employer contended that the strike and labor dispute did not end on February 19, 1960, since it was "involved in a labor dispute either with the striking union or a rival claiming the right to represent the 'new hires' past February 19." The *Johnson* court rejected this argument, stating:

The evidence showed the employees were ready and able to return to work after February 19, 1960. The dispute was ended insofar as the parties were concerned when they agreed to accept the decision

---

1. We note that the trustee's letter contains no promise that respondents would not begin another strike if the labor dispute were not resolved to their satisfaction.

of the arbitrators. The public policy against interference in a strike or labor dispute then dissolved and the policy of alleviating hardships resulting from unemployment became applicable.

*Johnson,* 266 Minn. at 514, 124 N.W.2d at 505.

In sum, we find the *Johnson* facts and decision controlling, and are bound by its analysis. We decline to carve out exceptions here and thereby create new law. *Johnson* mandates a determination that the labor dispute, and thus respondents' disqualification, ended on September 12, 1986, when the new collective bargaining agreement was ratified.

### 3. *Individual Offers to Return*

▇ The Commissioner found the individual respondents who tendered offers to return to work before the strike ended remained disqualified from unemployment benefits because they were "directly interested" in the strike. Minn.Stat. § 268.09, subd. 3 supports the Commissioner's determination. Again, that statute provides:

> An individual who has left or partially or totally lost employment with an employer because of strike or labor dispute * * * shall be disqualified for benefits:
> (a) For each week during which the strike or labor dispute is in progress; * * *

*Id.*

Here, the strikers who attempted to return to work before the strike was over left their employment with Hormel because of the labor dispute; at the time the strike began, these employees were participating in and directly interested in the strike. The Commissioner correctly determined they should be disqualified from receiving benefits for each week during which the labor dispute was in progress.

Respondents argue their offers to return to work were made after the International had withdrawn its authorization for the strike; thus, because they were complying with the International's directives, they should not be disqualified from receiving benefints. Nevertheless, since the labor dispute continued after the strike ended,

the fact that the International had withdrawn its sanction of the strike is not determinative. The statute specifically indicates if the labor dispute continues, so does the disqualification.

### 4. *Request to Reopen the Record*

▇ The Commissioner determined that because the trustee was respondents' valid representative, evidence regarding NAMPU was irrelevant to this case. The Commissioner therefore upheld the referee's refusal to reopen the record for new evidence regarding NAMPU.

Hormel disputes this determination, arguing additional evidence regarding NAMPU would establish the labor dispute had not ended until the controversy involving NAMPU had been resolved.

As discussed above, we need only determine when the labor dispute which initially caused the unemployment ended. The dispute involving NAMPU was not the cause of respondents' initial unemployment. Therefore, evidence regarding NAMPU is, as the Commissioner determined, irrelevant to the issues involved in this case.

## DECISION

1. The Commissioner correctly determined respondents filed valid claims for benefits immediately after the strike began in August 1985.

2. The Commissioner erred by determining respondents' disqualification ceased with the trustee's May 23 offer. The strike itself did not end until June 4, and the labor dispute continued until September 12.

3. The Commissioner properly concluded those respondents who made individual offers to return to work before the labor dispute ended remained disqualified from receiving unemployment compensation benefits.

4. The Commissioner did not err by refusing to reopen the record for additional evidence regarding NAMPU.

*Affirmed in part and reversed in part.*

NORTON, Presiding Judge, dissenting.

I respectfully dissent, and would affirm the Commissioner's decision. I agree with him that the *Johnson* case supports a conclusion that the strike ceased "active progress" when the trustee told Hormel in his letter of May 23, 1986 that respondents would no longer withhold their labor. The strike was then over, and any unemployment of respondents was no longer caused by the strike, but by the unavailability of work due to Hormel's employment of replacement workers.

The strike in the *Johnson* case occurred in 1959. In recent years there have been a number of cases that recognize that once a strike ceases "active progress," the unemployment laws should be liberally construed to deal with the severe economic problems of the employees by allowing benefits.

The case most closely on point is *The Skookum Co. v. Employment Division*, 24 Or.App. 271, 545 P.2d 914, *aff'd* 276 Or. 303, 554 P.2d 520 (1976), where striking employees returned to the job site prior to signing a final contract between their union and employer but were not put to work by the employer. There, the employer decided not to rehire the striking employees, but instead retained replacement workers. The Oregon court affirmed the decision of the Employment Appeals Board, holding that the post-strike unemployment was not due to a labor dispute, but to the unavailability of work. *Skookum*, 24 Or.App. at 275, 545 P.2d at 916.

The *Skookum* case is clearly more factually on point than is *Johnson*, which the majority cites for the proposition that the Hormel strike and labor dispute ended when the union voted to approve the settlement.

A number of other cases more recent than *Johnson* seem to be formulating a modern approach, in which in varying factual situations the termination of a labor dispute in active progress ends disqualification for unemployment benefits. *See, e.g., Randall, Burkart/Randall, Division of Textron, Inc. v. Daniels*, 268 Ark. 375, 597 S.W.2d 71 (1980); *In re Acquisto*, 25 A.D. 2d 326, 269 N.Y.S.2d 567 (1966); *In re Sarvis*, 296 N.C. 475, 251 S.E.2d 434 (1979); *General Motors Corp. v. Unemployment Compensation Bd. of Review*, 210 Pa.Super. 223, 232 A.2d 35, *aff'd* 427 Pa. 645, 234 A.2d 859 (1967).

I believe the Commissioner correctly ruled that *Johnson* is authority for a determination that respondents' disqualifications for unemployment compensation benefits ceased on the date of the trustee's letter, May 23, 1986. An administrative agency's construction of its own statutes, although not binding upon this court, is entitled to great weight unless it is found to be erroneous and in conflict with the expressed purpose of the act and intention of the legislature. *In re Estate of Raynolds*, 219 Minn. 449, 456–57, 18 N.W.2d 238, 242 (1945); *Mattson v. Flynn*, 216 Minn. 354, 362–63, 13 N.W.2d 11, 16 (1944). Here, the Commissioner liberally construed the term "active progress," determining that respondents' strike ceased active progress after the trustee's letter of May 23. This construction comports with the purpose of the unemployment compensation statutes, which are humanitarian in nature and should be liberally construed. *Group Health Plan, Inc. v. Lopez*, 341 N.W.2d 294, 296 (Minn.Ct.App.1983); Minn.Stat. § 268.03 (1986).

I would further note that this strike was unnecessarily extended as the result of a dispute between the union's International and Local P–9. Respondents suffered additional unemployment due to this dispute. This court should recognize this unusual intra-labor disagreement and reduce the severe economic effect upon the workers.