**GEO. A. HORMEL & COMPANY,**
Petitioner, Relator,

v.

**Myron ASPER, et al., Respondents,**

and

**Commissioner of Jobs and Training,**
Petitioner, Relator.

Nos. C4–87–929, C8–87–965.

Supreme Court of Minnesota.

Aug. 5, 1988.

Timothy G. Costello, James B. Sherman, Milwaukee, Wis. and James W. Cavanaugh, Austin, for Geo. A. Hormel & Co.

Hubert H. Humphrey, III, Atty. Gen., Donald E. Notvik, Asst. Atty. Gen., St. Paul, for Dept. of Jobs and Training.

David S. Anderson, St. Paul, for Myron Asper, et al.

AMDAHL, Chief Justice.

Both employer, Geo. A. Hormel & Company (Hormel), and the Commissioner of the Minnesota Department of Jobs and Training (Commissioner) requested further review of a court of appeals decision concerning entitlement to unemployment compensation benefits of former striking employees at Hormel's Austin, Minnesota facility.

The court of appeals held: (1) the initial claims for unemployment compensation benefits filed immediately after the strike began were valid; (2) individual strikers who had tendered unconditional offers to return to work prior to the end of the labor dispute remained disqualified from unem-

ployment compensation benefits; and (3) the Commissioner did not err in refusing to reopen the record to admit evidence of activities of a rival union. *George A. Hormel & Company v. Asper*, 415 N.W.2d 706 (Minn.App.1987). We affirm these three issues.

However, the court of appeals reversed the Commissioner's determination that the strike ceased active progress on May 23, 1986 when the trustee of Local P-9 tendered an unconditional offer to return to work on behalf of all striking employees. We disagree with the holding that the claimants remained ineligible for benefits until a new contract was ratified on September 12, 1986. We therefore reverse the court of appeals on this issue, and we reinstate the Commissioner's decision.

Hormel operates a meat-processing plant in Austin, Minnesota. Claimants/employees were all production or maintenance workers at that facility and were represented by Local P-9 of the United Food and Commercial Workers International Union (UFCW). In August 1985, contract negotiations between Hormel and the representatives of the union reached an impasse, and on August 11, 1985, the membership of Local P-9 voted to strike. Picket lines were established outside the Austin facility on August 17, 1985.

Immediately after the strike began, the claimants/employees applied for unemployment compensation benefits. The Commissioner determined that the claims were valid under the statute, but because they had become unemployed as the result of a strike against their employer, the claimants were disqualified from receiving benefits for each week the strike was in progress. Neither Hormel nor the claimants appealed from this decision.

On January 4, 1986, Hormel sent all employees a letter informing them that the Austin facility would be reopened and requesting that they cease their strike activity and return to work. These claimants refused, however, and the strike continued. By March 1, 1986, Hormel had filled all available positions with new hires or former strikers who elected to cease participation in the strike and reclaim their jobs.

On March 13, 1986, the international union of the UFCW withdrew its sanction for the strike and instructed the leadership of Local P-9 to "cease the strike and all related activities * * * and to make an offer to return to work on behalf of all remaining striking members in order to expedite their re-employment and to remove an obstacle to their qualifying for unemployment compensation pending re-employment." The local union refused to comply with the directive, however, and strike activities continued.

After the withdrawal of the parent union's support, several individual claimants made unconditional offers to return to work. Nonetheless, no job vacancies existed and so, these claimants remained unemployed.

On May 7, 1986, the international union imposed a trusteeship on Local P-9. On May 23, 1986, Trustee Joseph Hansen sent a telegram to Hormel, making an unconditional offer to return to work on behalf of all striking employees:

> This is to advise you that UFCW Local P-9's strike against the Hormel Company is hereby terminated and I hereby make an unconditional offer to return to work on behalf of all striking employees of Hormel in Austin, Minnesota. In addition, you have received previous communications from me demanding that you contact me for purposes of setting up a bargaining session for the purpose of attempting to reach a collective bargaining agreement. This is to renew that demand and to further advise you that Local P-9's challenge to the trusteeship which had previously been filed in the United States District Court for the District of Columbia has now been transferred to the United States District Court of the District of Minnesota and, consequently, it is our position that there is no impediment to your bargaining with me as the representative of Local P-9.

Nonetheless, strike activity continued at the Austin facility.

On June 2, 1986, the U.S. District Court of the District of Minnesota enforced the trusteeship of Local P–9, and a few days later, the picketing ceased.

Certain former members and officers of Local P–9 responded to the imposition of the trusteeship by forming a new union, the North American Meatpackers Union (NAMPU), among the striking employees of Hormel. On July 2, 1986, NAMPU filed a petition with the National Labor Relations Board seeking representative status as the collective bargaining agent of the production and maintenance workers of Hormel.

Negotiations between the trustee of Local P–9 and Hormel continued throughout the summer, and a tentative four-year collective bargaining agreement was reached on August 28, 1986. Members of Local P–9 ratified the agreement in a mail referendum on September 12, 1986.

 .1. The scope of review of an agency decision is limited. This court has stated: "The narrow standard of review upon appeals from decisions of the commissioner is that the findings are to be reviewed in a light most favorable to the decision and if there is evidence reasonably tending to sustain them, they will not be disturbed." *Reserve Mining Co., Babbitt Division v. Gorecki*, 316 N.W.2d 547, 549 (Minn.1982).

 On the other hand, an appellate court is not bound by the Commissioner's conclusions of law but is free to exercise its independent judgment. *Smith v. Employers' Overload Co.*, 314 N.W.2d 220, 221 (Minn.1981); *Johnson v. Wilson & Co.*, 266 Minn. 500, 509, 124 N.W.2d 496, 501 (1963). However, an agency's interpretation of the statutes it administers is entitled to deference and should be upheld, absent a finding that it is in conflict with the express purpose of the Act and the intention of the legislature. *In re Estate of Raynolds*, 219 Minn. 449, 18 N.W.2d 238 (1945); *Mattson v. Flynn*, 216 Minn. 354, 13 N.W.2d 11 (1944); *Geo. A. Hormel & Company v. Asper*, 415 N.W.2d 706, 714 (Minn.App. 1987) (Norton, J., dissenting).

The unemployment compensation statute itself has also been interpreted by this court:

[W]e have stated on numerous occasions that the unemployment compensation statute is remedial in nature and must therefore be liberally construed to effectuate the public policy of Minn.Stat. § 268.03 (1980) that unemployment reserves be used "for the benefit of persons unemployed through no fault of their own." * * * For this reason the disqualification provisions of this statute are to be narrowly construed.

*Smith v. Employers' Overload*, 314 N.W.2d at 221–22.

2. Immediately after the work stoppage at Hormel's Austin facility in August 1985, the striking employees filed claims for unemployment compensation benefits. The Commissioner determined that these claims were valid.

 A valid claim for unemployment compensation benefits is defined as "a claim filed by an individual who has registered for work and who has earned wage credits and established credit weeks during his base period sufficient to entitle him to benefits under section 268.07, subdivision 2." Minn.Stat. § 268.04, subd. 24 (1984).

Section 268.07, subdivision 2 requires an individual to earn "15, or more credit weeks within the base period of employment" to be eligible for benefits. The base period of employment is further defined as "the period of 52 calendar weeks immediately preceding the first day of an individual's benefit year." Minn.Stat. § 268.04, subd. 2. A benefit year is defined as "the period of fifty-two calendar weeks beginning with the first day of the first week with respect to which the individual files a valid claim for benefits." Minn.Stat. § 268.04, subd. 4.

Thus, when the Commissioner found that these claimants had filed valid claims, the effect was to freeze their base periods, in which they had the requisite number of credit weeks of employment. Having determined that the claims were valid, however, the Commissioner proceeded to declare the claimants disqualified from re-

ceiving unemployment compensation benefits at that time because their unemployment was the result of a strike (as opposed to a lockout) at Hormel. *See* Minn.Stat. § 268.09, subd. 3 (1984). Hormel did not appeal this decision at this time. Based on Hormel's failure to appeal, the court of appeals affirmed the validity of these claims on procedural grounds: "Hormel in 1985 had the opportunity to litigate and appeal the issue of validity; thus, we believe the first decision constitutes the law of the case." *Hormel*, 415 N.W.2d at 710.

Hormel now argues that the Commissioner erred in finding the claims filed in 1985 were valid. Hormel maintains that because the employees were disqualified from receiving benefits at the time the claims were filed, the issue of the validity of the claims themselves did not ripen until after the cessation of the strike.

The legislative policy of the unemployment compensation statute is enunciated in the statute itself:

> Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burdens. * * * The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state will be promoted by providing, under the police powers of the state for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

Minn.Stat. § 268.03 (1984).

Individuals on strike are not "unemployed through no fault of their own" and therefore are ineligible to collect unemployment compensation benefits. Minn.Stat. § 268.09, subd. 3. Further, this court has stated that the purpose of the disqualification of employees who lose employment because of a strike is to make the state neutral between the parties to a labor dispute. *Johnson v. Ford Motor Co.*, 289 Minn. 388, 394, 184 N.W.2d 786, 791 (1971) (*citing Nordling v. Ford Motor Co.*, 231 Minn. 68, 76, 42 N.W.2d 576, 581, 28 A.L.R. 2d 272, 279 (1950)). The statute is to be construed to maintain the balance between labor and management:

> It may be said that the purpose of [the statute] is to preserve the status quo of the parties during the course of a labor dispute so that at its cessation they will stand in the same relation to each other as at the beginning so far as the payment of benefits under the act is concerned. The legislative policy underlying this statute protects employers from having to finance a strike against themselves, as would be the case if their accounts were charged for payment of unemployment compensation benefits to their employees during the progress of a labor dispute.

*Kitchen v. G.R. Herberger's, Inc.*, 262 Minn. 135, 138, 114 N.W.2d 64, 66 (1962).

Hormel argues that the recognition of these claims as valid, in effect, forces it to finance a strike against itself. The period is only delayed; the same benefits are payable to the same recipients. Hormel contends that this result clearly contradicts the legislative intent of the statute.

We disagree.

The statutory language is unambiguous. The initial determination that these claims were valid was correct. *See* Minn.Stat. § 268.04, subd. 24. These individuals (1) were registered for work, despite the strike at Hormel, and (2) had established sufficient credit weeks to qualify for benefits. Hormel could have appealed that decision in 1985 but did not.

Further, Hormel is not being asked to finance a strike against itself. Hormel did not have to pay benefits to its employees while they were actually on strike. Hormel's argument that the financing of the labor dispute was merely delayed is without merit. Had the labor dispute ended within a few weeks or months, there is no doubt that unemployment compensation benefits would be payable to these claimants if Hormel had no available jobs for them because of replacement workers.

Furthermore, the benefit year and base period of each claim would be computed based on employment at Hormel, and therefore, any benefits paid would be chargeable to Hormel's experience ratio. The status quo of the parties, as it existed at the commencement of the strike, would be restored. Yet, during the course of the labor dispute itself, the state would have maintained a neutral position. Thus, the plain language and policy of the statute alike are served.

We hold that the claims for unemployment compensation benefits filed at the inception of the work stoppage were valid, notwithstanding the strike disqualification of the claimants.

■ 2. At the hearing on appeal to the Commissioner, Hormel attempted to obtain membership lists of the newly-formed North American Meatpackers Union (NAMPU). These efforts failed, and Hormel filed a post-hearing Motion to Reopen the Record to admit newly-discovered evidence that NAMPU was prolonging the labor dispute even beyond the date that the new collective bargaining agreement was ratified. The Commissioner's representative did not actually rule on the Motion, but he did state that any evidence of a rival union was irrelevant to the initial labor dispute which caused the claimants' unemployment. The court of appeals affirmed.

Hormel argues that the trustee's status, while recognized by the courts, was questioned by the rank and file membership of the union. The focus, Hormel alleges, should be on whether a controversy exists regarding terms and conditions of employment. Such a controversy could include representation issues. *See* Minn.Stat. § 179.01, subd. 7. The very existence of NAMPU indicates that the dispute did not end with the imposition of a trusteeship or the end of the strike or even the signing of a new collective bargaining agreement.

We disagree. The dispute involving NAMPU was not the cause of the initial unemployment at Hormel. Therefore, evidence of the inter-union rivalry was properly excluded as irrelevant to the unemploy-

ment compensation issues before the Commissioner.

Moreover, the Commissioner has broad discretion to establish the record in unemployment compensation hearings. Minn. Stat. § 268.10, subds. 5 and 6. We can find no abuse of that discretion here. Therefore, we hold that the Commissioner did not err in refusing to reopen the record to admit evidence of the activities of NAMPU.

■ 3. After the parent union withdrew its support of Local P–9's activities at the Hormel plant, but prior to the end of the strike, several union members tendered unconditional offers to return to work. No jobs were available, and they then applied for unemployment compensation benefits.

The Commissioner found, and the court of appeals affirmed, that these individual offers did not lift the strike disqualification for unemployment compensation benefits.

The statute governing disqualification for unemployment compensation benefits specifically states that an individual who has become unemployed because of a strike or labor dispute remains disqualified "for each week during which the strike or labor dispute is in progress." Minn.Stat. § 268.09, subd. 3. No one argues that the strike or labor dispute ended in March. Rather, Local P–9 defied the directive of its parent union, and all strike activity continued. While this action may well be considered beyond the local union's authority (and therefore ultra vires), the fact remains that the labor dispute did not end with the withdrawal of the parent union's sanction.

The claimants argue that once the international union withdrew its sanction, all strike activity became illegal, and Local P–9 lost its authority as their valid representative. By individually offering to return to work, these individuals were only following the orders of the international union.

However, nothing in the statute provides for an individual striking employee to disassociate himself from the labor dispute and thereby become eligible for unemployment compensation benefits. Once disqualified under the statute, an individual re-

mains disqualified until the conclusion of the strike or labor dispute.

This court has held that an employee need not even be a member of the striking union to be disqualified from benefits because of a labor dispute at the employer's establishment. *Lehmann v. Western Airlines, Inc.*, 291 Minn. 6, 188 N.W.2d 883 (1971). The employees in *Lehmann* claimed that they were innocent victims of a strike beyond their control. They neither recognized, condoned, sanctioned, nor participated in the strike that kept them from their jobs. Still, this court held that the disqualification continued throughout the strike, "despite the complete absence of fault on the part of the nonparticipating employee." *Lehmann*, 291 Minn. at 9, 188 N.W.2d at 885. The court stated: "Minnesota is now one of nine states providing for a blanket disqualification in which the question of participation, financing, or interest in the strike or labor dispute has no further bearing upon the question of disqualification." *Id., citing Nordling* at 74, 42 N.W.2d at 580.

These claimants concede that they were involved in the strike at Hormel at its inception. If not actively participating in the strike when they made their individual offers to return to work, they certainly were directly interested in the dispute. Their argument that they should be allowed to abandon the course of conduct set by the union at will simply is not supported by Minnesota law.

We hold that individual offers made prior to the cessation of a strike or labor dispute do not lift the strike disqualifications for unemployment compensation benefits.

■ 4. The key to the end of the disqualification for unemployment compensation for all striking employees at Hormel is the cessation of the strike or labor dispute.

Minnesota law provides:

An individual who has left or partially or totally lost his employment with an employer because of a strike or other labor dispute at the establishment in which he is or was employed shall be disqualified for benefits:

(a) For each week during which the strike or labor dispute is in progress; or

(b) For one week following the commencement of the strike or labor dispute if he is not participating in or directly interested in the strike or labor dispute.

\* \* \* \* \* \*

For the purpose of this subdivision the term "labor dispute" shall have the same definition as provided in the Minnesota labor relations act.

Minn.Stat. § 268.09, subd. 3 (1984).

The Minnesota Labor Relations Act defines a "labor dispute" as:

[A]ny controversy concerning employment, tenure or conditions or terms of employment or concerning the association or right of representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms, tenure, or other conditions of employment, regardless of whether or not the relationship of employer and employee exists as to the disputants.

Minn.Stat. § 179.01, subd. 7 (1984).

This court has characterized Minnesota's statute as an "active progress" type of statute in which "the worker is disqualified only if a strike or other labor dispute is in active progress." *Johnson v. Wilson & Co.*, 266 Minn. 500, 510, 124 N.W.2d 496, 502–03 (1963).[1]

In *Johnson*, a labor dispute resulted in a strike at the Wilson meatpacking plant in Albert Lea, Minnesota, on November 3, 1959. The employer began hiring replacement workers to operate the plant by the

---

1. The other type of statute is the "work stoppage" type where the disqualification of the employee is attached to work stoppage at the establishment where the labor dispute occurs. Under the work stoppage type of statute, when operations resume with replacement workers, the disqualification of the strikers for unemployment compensation benefits ends. *See Johnson*, 266 Minn. at 509, 124 N.W.2d at 503. *See generally* Comment, *Unemployment Compensation—An Examination of Wisconsin's "Active Progress" Labor Dispute Disqualification Provision*, 1982 Wis.L.Rev. 907 (1982).

end of that month, and a series of negotiations were held during December and January without agreement. Finally, on February 12, 1960, the parties agreed to submit disputed matters to arbitration; the interim agreement was ratified by the rank and file membership on February 19. The *Johnson* court stated:

> The evidence showed the employees were ready and able to return to work after February 19, 1960. The dispute was ended in so far as the parties were concerned when they agreed to accept the decision of the arbitrators. The public policy against interference in a strike or labor dispute then dissolved and the policy of alleviating hardships resulting from unemployment became applicable.

*Johnson,* 266 Minn. at 514, 124 N.W.2d at 505.

■ The Commissioner determined that the active progress of the Hormel strike, and with it, the underlying labor dispute, ceased on May 23, 1986, when the trustee, acting on behalf of the membership of Local P–9, made an unconditional offer to return to work. The court of appeals, however, reversed. The court of appeals reasoned that while the strike may have ceased "active progress" early in June, the "active progress" of the underlying labor dispute did not end until the membership of Local P–9 actually ratified a new collective bargaining agreement on September 12, 1986. *Hormel,* 415 N.W.2d at 711. We disagree with the court of appeals, and we reinstate the commissioner's decision.

The strike ended on May 23, 1986. At that time, through the trustee, the claimants indicated that they were willing to accept any wages and working conditions which Hormel would make available. It mattered not that some issues remained unresolved. It mattered not that, should the offer be accepted, these employees would be working without a contract. As far as these employees were concerned, the dispute was ended, just as the *Johnson* dispute was ended for the employees of

Wilson & Company when they agreed to accept the decision of the arbitrators. *Johnson,* 266 Minn. at 514, 124 N.W.2d at 505.

The U.S. District Court's order of June 2, 1986 merely affirmed the trustee's authority to make that offer; the court did not actually grant that authority.

Of course, no jobs were available at the Austin facility for the claimants. The jobs had already been filled with replacement workers. However, although some picketing did continue until early in June,[2] for purposes of unemployment compensation benefits, we believe that the strike disqualification was lifted when the employees indicated that they were ready and willing to work.

It is true that a strike is only one form of activity within the broader parameters of a labor dispute. The Minnesota Labor Relations Act defines a strike as "the temporary stoppage of work by the concerted action of two or more employees as a result of a labor dispute." Minn.Stat. § 179.01, subd. 8 (1984).

Nonetheless, we decline to extend the concept of active progress of the underlying labor dispute into the negotiations for a new collective bargaining agreement that ensued following the cessation of picketing. Those individuals who were working at Hormel were working without a contract, and it is not unreasonable to expect that the parties would negotiate over the terms and conditions of employment to be embodied in a collective bargaining agreement after the active progress of the labor dispute had ceased. We think that, insofar as a labor dispute existed at all during those negotiations, it was no longer in active progress, but rather had entered an inactive or latent phase.

Furthermore, in an active progress statute such as we have in Minnesota, causation is a necessary element of the analysis. *See Johnson,* 266 Minn. at 514, 124 N.W.2d at 505; *accord, In re Sarvis,* 296 N.C. 475, 480, 251 S.E.2d 434, 438 (1979) (relying on

---

**2.** Contrary to the court of appeals' reasoning, continued picketing does not invalidate the unconditional nature of an offer to return to work.

*See NLRB v. W.C. McQuaide, Inc.,* 552 F.2d 519, 529 (3d Cir.1977).

*Johnson* ). In *Johnson*, unresolved issues were removed as the *cause* of the claimants' unemployment when they agreed to arbitration. In *Hormel*, once the trustee withdrew all preconditions for returning to work, the *cause* of the claimants' unemployment was no longer the strike or labor dispute, but rather the non-existence of available jobs.

Of course, the statute itself specifically states that disqualification for benefits continues until the strike or labor dispute ends. Minn.Stat. § 268.09, subd. 3. We agree with the Commissioner's interpretation that once the active progress of a strike ends, the active progress of the labor dispute comes to a halt as well.

Other jurisdictions with active progress statutes have held that once strike activity has been terminated and workers have indicated a willingness to work, the active progress of the strike and labor dispute alike have ceased. *See, e.g., Randall, Burkart/Randall, Division of Textron, Inc. v. Daniels*, 268 Ark. 375, 597 S.W.2d 71 (1979) (labor dispute effectively ended when employees made unconditional offer to return to work); *Sarvis*, 296 N.C. 475, 251 S.E.2d 434 (labor dispute was no longer in "active progress" once employees renounced strike and unconditionally offered to return to work; pending unfair labor practice and petition for election before National Labor Relations Board did not keep labor dispute in "active progress" for purposes of unemployment compensation benefits); *Skookum Co. v. Employment Division*, 276 Or. 303, 554 P.2d 520 (1976) (labor dispute disqualification no longer applied once striking employees removed picket lines and reported for work, even though no contract was signed).

We hold that the strike, and with it, the underlying labor dispute, ceased active progress when the trustee, as the valid representative of the striking Hormel employees, declared the strike at an end and removed all barriers to the strikers' return to work through his unconditional offer.

 We believe that our interpretation properly reflects the policy of Minnesota's unemployment compensation statutes.

These statutes are humanitarian in nature and should be liberally construed. *Hendrickson v. Northfield Cleaners*, 295 N.W. 2d 384 (Minn.1980); Minn.Stat. § 268.03 (1984). If we have erred in our interpretation, the legislature may, of course, provide a statutory basis for a different result.

Affirmed in part and reversed in part.

KELLEY, J., took no part in the consideration or decision of this case.