DONALD E. ALLDREDGE, AND AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, AFL–CIO, APPELLANTS, v. ROBERT ARCHIE, EXECUTIVE DIRECTOR, NEVADA EMPLOYMENT SECURITY DEPARTMENT; BOARD OF REVIEW, NEVADA EMPLOYMENT SECURITY DEPARTMENT AND HUGHES AIR CORPORATION, DBA AIR WEST, RESPONDENTS.

No. 8621

October 11, 1977                     569 P.2d 940

*Douglas G. Crosby, Goodman and Snyder,* Las Vegas; *Marvin J. Brenner,* Burlingame, California, for Appellants.

*Robert List,* Attorney General, and *Donald Hill,* Deputy Attorney General, Carson City; *Morse, Foley & Wadsworth,* Las Vegas, and *John A. Flangas,* Reno, for Respondents.

## OPINION

By the Court, BATJER, C. J.:

This is an appeal from an order of the district court affirming an administrative decision, which denied unemployment compensation benefits to airline pilots who became unemployed due to a labor dispute between their employer and its airline mechanics. The denial of benefits was based upon the labor dispute disqualification set forth in NRS 612.395(1), which provides: "An individual shall be disqualified for benefits for any week with respect to which the executive director finds that his total or partial unemployment is due to a labor dispute in active progress at the factory, establishment or other premises

at which he is or was last employed." Further, it was determined the pilots were not exempted from disqualification under NRS 612.395(2), which provides:

> [NRS 612.395(1)] shall not apply if it is shown to the satisfaction of the executive director that:
>
> (a) The individual is not participating in or financing or directly interested in the labor dispute which caused his unemployment; and
>
> (b) The individual does not belong to a grade or class of workers of which, immediately before the commencement of the labor dispute, there were members employed at the premises at which the labor dispute occurs, any of whom are participating in or financing or directly interested in the labor dispute; . . .

The pilots contend NRS 612.395(1) is not applicable to the factual circumstance of their claims because their unemployment was not due to a labor dispute at the "factory, establishment or other premises" at which they were employed. Even if NRS 612.395(1) applies, they argue all pilots are eligible for benefits pursuant to NRS 612.395(2).

Since we conclude NRS 612.395(1) is applicable and all claimants fail to qualify under NRS 612.395(2), exclusive of Fairchild pilots, the judgment is affirmed, except that portion denying them benefits.

The interested employer, Hughes Air West, Inc., is a common carrier by air and authorized by appropriate governmental agencies to provide service to Canada, Mexico, and several western states. It has four domiciles, including Las Vegas, at which flight and ground personnel are based. Hughes utilizes two types of aircraft in its operations; the DC–9, which is a twin engine pure jet, and the Fairchild F–27, which is a twin engine turboprop. The claimants are pilots who are classified as DC–9 captains, DC–9 first officers, F–27 captains, and F–27 first officers. Their wages, hours, and working conditions are governed by a collective bargaining agreement between the employer and the Air Line Pilots Association (ALPA).

Several months prior to December 15, 1971, the Aircraft Mechanics Fraternal Association (AMFA) commenced negotiations with Hughes for a new contract covering the employment of airline mechanics. This union is independent from ALPA and does not represent airline pilots in any matter. When these negotiations broke down, the mechanics struck Hughes on December 15, 1971, and placed picket lines at McCarran International Airport in Las Vegas. As a result of

this strike, Hughes ceased all operations and advised its pilots that no work was available for them and they were being placed in a "no work" status. The pilots were required to return their identification badges and pass cards.

Shortly thereafter, Hughes decided to resume its DC–9 operations on a limited basis, using management personnel to perform the duties of the mechanics and senior DC–9 captains to fly the aircraft. On December 19, 1971, crew schedulers commenced to recall approximately 40 of the 80 most senior DC–9 captains based at Las Vegas, but the effort was abandoned on December 22 due to the massive refusal of the pilots to fly. Hughes did not utilize any of its F–27 equipment during the strike, and thus, no attempt was made to recall F–27 pilots and work remained unavailable for them.

1. The claimants first contend NRS 612.395(1) does not disqualify them from benefits because their unemployment was not caused by a labor dispute at the "factory, establishment or other premises" at which they were employed. In support of this contention, they argue that their work is performed in the aircraft as it flys over various air routes, and this constitutes a different place of employment than the air terminal where the mechanics' dispute occurred.

The phrase "factory, establishment or other premises" is not defined by the legislature in NRS Ch. 612 or elsewhere. This language evolved from the provision "factory, workshop or other premises" contained in the British Act of 1911 upon which our law is patterned. *See* Park v. Appeal Board of Michigan Employ. Sec. Com'n, 94 N.W.2d 407 (Mich. 1959); Nordling v. Ford Motor Co., 42 N.W.2d 576 (Minn. 1950). While the British have construed the phrase as referring to single units of employment, American jurisdictions utilize various criteria as a basis for determining whether two plants or workplaces constitute a single "factory, establishment or other premises" for purposes of unemployment benefits. *See* Annot., 60 A.L.R.3d 11 (1974) and cases cited therein.

Some jurisdictions rest their determinations solely on the aspect of functional integration, which relates to the degree of interdependency and synchronization between the operations and locations involved. *See, e.g.,* Ford Motor Co. v. Abercrombie, 62 S.E.2d 209 (Ga. 1950). Others rely on the physical proximity between the location of the labor dispute and the place of employment of those claiming benefits. *See, e.g.,* In re Ferrara's Claim, 176 N.E.2d 43 (N.Y. 1961); Walgreen Co. v. Murphy, 53 N.E.2d 390 (Ill. 1944). Still others reject

both of these approaches as the sole criteria and instead look to a combination of factors, including functional integration, physical proximity, and unity of employment and management. *See* Liberty Trucking Co. v. Department of Industry, Etc., 204 N.W.2d 457 (Wis. 1973); Park v. Appeal Board of Michigan Employ. Sec. Com'n, *supra;* Nordling v. Ford Motor Co., *supra.*

No absolute rule is available which can be arbitrarily applied to the facts of all cases in determining whether two work areas are a single "factory, establishment or other premises." Instead, such determination depends on a variety of factors, including functional integration and physical proximity, as applied to the factual circumstance of each case.

Here, there is a high degree of functional integration between the pilots and striking mechanics. The services performed by each intertwine to produce the end result of air transportation. The pilots cannot perform their services without the mechanics first performing theirs. The pilots based in Las Vegas reported to work at the air terminal, performed various functions there, made transportation runs out of the terminal, and returned there. Under these circumstances, they were employed at the same "factory, establishment or other premises" as the mechanics. *See* Depaoli v. Ernst, 73 Nev. 79, 309 P.2d 363 (1957); Noblit v. Marmon Group-Midwest Foundry Division, 194 N.W.2d 324 (Mich. 1972). Merely because the pilots perform various duties in the aircraft as it proceeds over air routes does not alter this conclusion. *Cf.* Basso v. News Syndicate Co., Inc., 216 A.2d 597 (N.J. App. 1966).

2. Although the claimants are included within the purview of NRS 612.395(1), our labor dispute disqualification contains a proviso (NRS 612.395(2)) that sets forth a two part conjunctive test which, if satisfied, removes their ineligibility for benefits. The claimants have the burden to show they meet the requirements of the proviso. F.R. Orr Construction Co., Inc. v. Industrial Com'n, 534 P.2d 785 (Colo. 1975); Wilson v. Employment Security Commission, 389 P.2d 855 (N.M. 1963).

The first requirement is contained in NRS 612.395(2)(a), which exempts those who are not "participating in or financing or directly interested in the labor dispute which caused [their] unemployment." It is conceded that the pilots were not financing or directly interested in the dispute. However, it was determined that, because the DC–9 captains refused to report for

work, the pilots were honoring AMFA picket lines and, therefore, participating in the dispute.

The question of eligibility for benefits of a nonstriking worker who has failed or refused to report to work across picket lines depends on the voluntary-involuntary nature of the claimant's refusal to cross. Absent a sufficient excuse, a nonstriking employee's voluntary failure or refusal to cross a picket line constitutes participation in the dispute, thereby disqualifying him for benefits. *See* Annot., 62 A.L.R.3d 380 (1975) and cases cited therein. This is true even though the picket lines are maintained by members of a union to which the claimant does not belong. Achenbach v. Review Board of Indiana Emp. Sec. Div., 179 N.E.2d 873 (Ind. 1962). The rationale for the rule is that:

> [S]uch a refusal [to cross picket lines] does constitute participation, since by so refusing to work the persons are adding their strength to the cause of the strikers, who are then put in a better bargaining position when the entire plant is shut down than when their branch of it has stopped only a portion of the operations. Various Claimants & Const. U. v. Employment Sec. Com'n, 375 P.2d 380, 382 (Ariz. 1962).

The massive refusal of DC–9 captains to report for flying duty supports the conclusion they were honoring the AMFA picket lines at McCarran Airport.[1] Nevertheless, they argue their refusal to cross the picket lines was justified due to their fear of bodily harm.

It is recognized that one who has reason to fear violence or bodily harm is not required to cross a picket line to establish his eligibility for benefits. *See* Annot., 62 A.L.R.3d 380 (1975) and cases cited therein. While it is not necessary that he actually experience bodily harm in attempting to cross a picket line, a nonstriker's fear must be real and substantial, not nebulous or imaginary. *See* Kennecott Copper Corp., Etc. v. Employment Sec. Com'n, 469 P.2d 511 (N.M. 1970); Achenbach v. Review Board of Indiana Emp. Sec. Div., *supra.*

[1] The record indicates that Las Vegas crew schedulers made between 300 to 500 phone calls to about 40 DC–9 captains. The response, if any, to these calls was that the pilot was sick, out of town, or unwilling to cross the picket line.

While the record does indicate some anonymous telephone calls were made threatening DC–9 captains, no such calls were made prior to December 20, 1971. There is no evidence that any violence occurred or that the picket lines were anything but peaceful. Indeed, others crossed the picket lines without mishap. In light of these facts and the total absence of violence, the DC–9 captains' refusal to cross the picket lines disqualifies them for unemployment compensation benefits.

Although the DC–9 captains were participating in the dispute by honoring picket lines, the record clearly establishes the remainder of the claimants were not. It is conceded that Hughes was not offering work for DC–9 first officers. Only the most senior DC–9 captains were being recalled for limited operations. Further, no F–27 captains or first officers were called because Hughes did not utilize any of its Fairchild equipment during the strike. So far as these claimants are concerned, no work was ever made available to them. As noted in Ancheta v. Daly, 461 P.2d 531 (Wash. 1969), which is applicable here:

> [T]he law does not require a futile act in order to collect benefits. If there is no work available and the employee has been given every indication that he is laid off, he is not further required to cross a picket line in order to show his lack of participation in the labor dispute. *Id.* at 536. *See also* Kennecott Copper Corp., Etc. v. Employment Sec. Com'n, *supra*.

3. Since DC–9 first officers and F–27 pilots were not participating in the strike, they are eligible for benefits unless they are considered to be in the same "grade or class" as the DC–9 captains who were participating. Our legislature has seen fit to disqualify a claimant if he belongs to "a grade or class of workers of which . . . there were members employed at the premises at which the labor dispute occurs, any of whom are participating in or financing or directly interested in the labor dispute; . . ." NRS 612.395(2)(b). Thus, if a claimant falls within such grade or class, he is disqualified even though he is not involved in the dispute, has nothing to gain by it, and is involuntarily unemployed.[2]

---

[2]Due to such a result, provisions similar to NRS 612.395(2)(b) have been criticized as one of the most remarkable principles of vicarious guilt found in law, thwarting the basic purpose of unemployment

As with the "factory, establishment or other premises" provision, courts have found it difficult to establish criteria for the application of the "grade or class" provision. Determinations that a claimant does or does not belong to a particular grade or class have been based upon membership in a union or bargaining unit, whether the work of one group depends upon the work of another, the community of interest between the groups involved, or the type of work being performed with respect to the training, skills, and expertise involved. *See* Annot., 62 A.L.R.3d 314 (1975) and cases cited therein. No single test can be applied universally to all labor disputes. *See* Cameron v. De Board, 370 P.2d 709 (Ore. 1962).

Upon reviewing the record, we conclude that the Fairchild pilots and DC–9 pilots are in different grades or classes. The functions performed by Fairchild pilots are in no way affected by those of DC–9 pilots. The training, skills, and expertise of the two classes of pilots differs. The DC–9 is a more complex piece of equipment than the F–27. Further, Fairchild pilots can become authorized to fly DC–9 aircraft only after extensive ground training and passing a stringent F.A.A. examination. While all pilots belong to the same bargaining unit, this is not determinative under the factual posture of this case. *See* Members of Iron Workers' Union v. Industrial Com'n, 139 P.2d 208 (Utah 1943).

Accordingly, the judgment denying benefits to DC–9 pilots is affirmed as those pilots were participating in a labor dispute at the factory, establishment or other premises at which they were employed, or were members of a grade or class of workers so participating. However, since the F–27 pilots satisfy the requirements of NRS 612.395(2), that portion of the judgment upholding the denial of their benefits is reversed.

MOWBRAY, THOMPSON, and GUNDERSON, JJ., and McDANIEL, D. J., Concur.[3]

---

compensation to provide sustenance to those who are involuntarily unemployed. *See, e.g.,* Reuben and Schuckers, "The Labor Dispute Disqualification of the Pennsylvania Unemployment Compensation Law," 50 Temple L.Q. 211 (1977); Shadur, "Unemployment Benefits and the 'Labor Dispute' Disqualification," 17 U.Chi.L.Rev. 294 (1950).

[3]MR. JUSTICE ZENOFF voluntarily disqualified himself and took no part in this decision. The Governor, pursuant to Art. VI, § 4 of the Constitution, designated District Judge Joseph O. McDaniel to sit in his stead.