FOUR QUEENS, INC., DBA FOUR QUEENS HOTEL & CASINO, AND CALIFORNIA HOTEL AND CASINO, APPELLANTS, v. BOARD OF REVIEW OF THE NEVADA EMPLOYMENT SECURITY DEPARTMENT; APPEALS REFEREES OF NEVADA EMPLOYMENT SECURITY DEPARTMENT; THE EXECUTIVE DIRECTOR OF THE NEVADA EMPLOYMENT SECURITY DEPARTMENT; AND INDIVIDUAL CLAIMANTS: MARK ABBOTT, FRANCINE BROWN, BENITO CUNAHAN, JEAN DOTY, HENRY FEENSTER, RUTH FISHER, STEVE FRANKOVICH, DANI HALEY, SHIRLEY HECKARD, KATHY LEE, ZORAIDA LOZANO, DOROTHY MANIFOLD, BRYAN MOORE, CONNIE McMURRAY, ALMA MAE PHILLIPS, THOMAS PETERSON, BARRY REGAN, ROBERTO REYES, JERRY RILEY, RICHARD REUILLARD, LEONA SMART, MARY SOU, VI E. SULLIVAN, MERCEDES TACARONTO, RICHARD THEMMEN, ARLENE WALSH, MARIA WATSON, DEAN WHALEY, ROBERT WINDHORST, JOM WINGFIELD, SHIRLEY WOOD AND MILDRED YALICH, RESPONDENTS.

No. 18528

February 22, 1989                              769 P.2d 49

---

[6]THE HONORABLE ROBERT E. ROSE, Justice, did not participate in the decision of this appeal.

*Schreck, Jones, Bernhard, Woloson & Godfrey,* Las Vegas, for Appellants.

*Crowell, Susich, Owen & Tackes,* Carson City, for Respondent Employment Security Department.

*Timothy S. Cory,* Las Vegas, for Respondents Jean Doty and Alma Mae Phillips.

*Davis, Cowell & Bowe* and *Steven Stemerman,* Reno, for Respondents Jean Doty and Alma Mae Phillips.

## OPINION

By the Court, SPRINGER, J.:

This case involves the so-called "labor dispute disqualification" under Nevada's Unemployment Compensation Law. The labor dispute disqualification for unemployment compensation attaches to an applicant "for benefits for any week with respect to which the executive director [of the Employment Security Department] finds that his total or partial unemployment is due to a labor dispute in active progress at the . . . premises at which he is or was last employed." NRS 612.395.[1] An applicant so disqualified must be denied unemployment benefits.

---

[1] NRS 612.395 provides:

Appellant Four Queens contends that employee respondents ("Employees") were subject to the statutory labor dispute disqualification and therefore ineligible for benefits because their unemployment was due to a labor dispute. Employees contend that when Four Queens permanently replaced them with other employees, they were thereafter involuntarily unemployed, not due to a labor dispute, but due to their having been terminated by their employer.[2]

We hold that under the proper circumstances the labor dispute disqualification may be eliminated during a "labor dispute in active progress." The employment security director may decide "for any week" that an employee who has been involved in a labor dispute may still be eligible for unemployment benefits when the director finds that the employee is involuntarily unemployed and that the employee is no longer engaged in a labor dispute and no longer entitled to the gains sought by labor in a still-pending labor dispute.

The facts out of which these controversies arose are as follows. In the spring of 1984, Culinary Union Local 226 and Bartenders Union Local 165 attempted to negotiate a new labor agreement

1. An individual shall be disqualified for benefits for any week with respect to which the executive director finds that his total or partial unemployment is due to a labor dispute in active progress at the . . . premises at which he is or was last employed.

2. This section shall not apply if it is shown to the satisfaction of the executive director that:

(a) The individual is not participating in or financing or directly interested in the labor dispute which caused his unemployment; and

(b) The individual does not belong to a grade or class of workers of which, immediately before the commencement of the labor dispute, there were members employed at the premises at which the labor dispute occurs, any of whom are participating in or financing or directly interested in the labor dispute; but if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this section be deemed to be a separate . . . premise[.]

[2]Employees make no attempt to escape disqualification by invoking NRS 612.392(2). According to Employees, it would be impossible to meet the conjunctive requirements of NRS 612.395(2)(a) and (b) in the present case. As we observed in Alldredge v. Archie, 93 Nev. 537, 569 P.2d 940 (1977), "provisions similar to NRS 612.395(2)(b) have been criticized as one of the most remarkable principles of vicarious guilt found in law, thwarting the basic purpose of unemployment compensation to provide sustenance to those who are involuntarily unemployed. *See, e.g.,* Reuben and Schuckers, "The Labor Dispute Disqualification of the Pennsylvania Unemployment Compensation Law," 50 Temple L.Q. 211 (1977); Shadur, "Unemployment Benefits and the 'Labor Dispute' Disqualification," 17 U.Chi.L.Rev. 294 (1950). *Alldredge,* 93 Nev. at 543-44 n.2, 569 P.2d at 945 n.2.

with various Las Vegas hotel-casinos, including the Four Queens Hotel and Casino and the California Hotel and Casino, both owned by Four Queens, Inc. These negotiations failed; and, on April 1, 1984, the old labor agreement expired. On April 2, 1984, the unions began an economic strike against Four Queens. Negotiations between the unions and Four Queens continued during the strike.

By May, Four Queens chose to hire a number of permanent replacements for the striking workers in order to avoid having to close its businesses. On May 25, Four Queens told the unions that Four Queens would accept all of the basic terms of the contract most recently ratified by union members and further proposed an immediate return to work for the "vast majority of striking employees." Four Queens would not, however, agree to fire the permanent employees it had hired. The unions responded with the ultimatum that unless all union members were allowed to return to work, none would. Solely because of the impasse on this issue, the strike continued until both unions were de-certified in the middle of 1985.

Between August 29, 1984, and September 19, 1984, each of the Employees submitted a claim for unemployment benefits to the Employment Security Department ("ESD"). ESD initially determined that each of the employees was ineligible for benefits under NRS 612.395(1) because each was unemployed due to a labor dispute.

Sometime between September 1984 and March 1985, all of the Employees offered to return to work, some crossing picket lines in order to do so. Most of the Employees were informed that their former positions were unavailable because they had been filled by permanent replacements. The Employees were told that they would be placed on preferential hiring lists and called as positions became available.

A number of the Employees subsequently appealed their initial determinations of ineligibility to ESD appeals referees. The appeals referees concluded that the appealing Employees were eligible for benefits for the period beginning after they crossed the picket lines and modified the initial determinations accordingly. Other Employees apparently then filed new claims and were similarly found to be eligible for benefits because they had crossed picket lines and offered to return to work.

Four Queens appealed the decisions of the appeals referees in favor of the Employees to the ESD Board of Review. Those Employees who had been determined by the appeals referees to be disqualified for benefits also appealed to the Board of Review. The appeals were resolved in favor of the Employees.

Four Queens then filed a petition for judicial review and a motion for consolidation of the numerous claims for unemployment benefits it challenged. After a hearing on the consolidated actions on July 29, 1987, the trial court affirmed the decisions of the ESD Board of Review in favor of the Employees on August 25, 1987. On September 21, 1987, the trial court entered an order affirming the ESD Board of Review "in all respects."

On its face, Four Queens's argument that any unemployment suffered by the Employees was "due to" their participation in a labor dispute and that they are therefore statutorily disqualified from benefits appears to make sense. Certainly, "but for" the labor dispute the Employees would not have become unemployed. Acceptance of Four Queens's broad interpretation of causation would mean that anyone who ever participated in a labor dispute would continue to be ineligible until the dispute was over.[3] This conclusion, however, is at odds with the statute, which is worded in a way that seems to empower the ESD director to engage in periodic review of the disqualification while the dispute is still in active progress. Continued disqualification for benefits presupposes the employment security director's finding during "any week" that the applicant's unemployment continues to be due to the labor dispute. The statute would not have used the term "any week" had it intended unremediable debarment from eligibility for any employee who had participated in the ongoing labor dispute. The implication of the statute, read as a whole, is that it is permissible during a given week or weeks for benefits to be awarded if the "director finds" that the circumstances of the unemployment do *not* disqualify an employee during a "labor dispute in active progress." NRS 612.395(1). The question we must address is when and under what circumstance a labor dispute disqualification can be removed and eligibility for benefits reestablished.

Cases in other jurisdictions have generally held that the labor disqualification can be relieved under certain factual applications, but these cases differ as to how eligibility for benefits can be established. Some cases (*e.g.*, Ruberoid Co. v. California Unemployment Ins. App. Bd., 378 P.2d 102 (Ca. 1963)) have held that the mere incident of permanent replacement of a striking employee constitutes termination of that employee's employment, thus making the replaced employee eligible for benefits. We disagree with these rulings and the idea that eligibility should be grounded on the mere fact of replacement alone. Although it can

---

[3]Except, of course, in the unlikely event employees might be covered by the exception contained in NRS 612.395(2).

be argued that a striking employee who has been permanently replaced has not been unqualifiedly terminated and thus is not, strictly speaking, unemployed at all,[4] we do not base our decision on this ground and agree with the trial court that permanent replacement constitutes involuntary unemployment insofar as eligibility for unemployment benefits is concerned.

If, as we believe, the legislature intended that benefits may be allowed during any week that unemployment was not due to the labor dispute, then we must inquire into the kinds of circumstances in which the causal connection between the unemployment and the labor dispute is broken and eligibility therefore restored. We hold that a break in the link between unemployment and a labor dispute occurs when an employee abandons the dispute and repudiates the ends sought by the union in a dispute then "in active progress."

When the Employees in this case abandoned the strike and went back to their employer, Four Queens, asking for their old jobs back, they disengaged themselves from the labor dispute and were no longer a part of it; they were simply unemployed persons who sought unemployment subsistence until they could get another job. These applicants could honestly say to the director: "I lost my job because I went on strike and was replaced, but now I have abandoned the strike and have nothing to gain were the strike to be successful. My unemployment is now 'due to' my being unable to find a job and is no longer connected to activities associated with the labor dispute, which I have repudiated and abandoned."

An unconditional offer to return to one's former employment or other acts which show a separation from the labor dispute may be taken by the director as evidence from which the director can

---

[4]Indeed, some courts have felt this position to be dictated by federal labor law. In N.L.R.B. v. Mackay Radio & Tel. Co., 304 U.S. 333 (1938), the United States Supreme Court explained that the National Labor Relations Act does not prohibit an employer from hiring new employees to replace those participating in a strike, nor does it bind an employer to discharge replacement workers to allow strikers to resume their employment. Nevertheless, in N.L.R.B. v. Fleetwood Trailer Co., 389 U.S. 375 (1967), the Supreme Court held that permanently replaced employees are entitled to reinstatement unless the employer is able to show a "legitimate and substantial business reason" for failing to rehire. Similarly, the courts in Laidlaw Corp. v. N.L.R.B., 414 F.2d 99 (7th Cir. 1969), cert. denied, 397 U.S. 920 (1970), and N.L.R.B. v. American Olean Tile Co., Inc., 826 F.2d 1496 (6th Cir. 1987), have written that permanently replaced employees who unconditionally apply for reinstatement are entitled to reinstatement as the appropriate vacancies occur. In Standard Materials v. Administrator, Employ. Sec., 401 So.2d 400 (La.App. 1981), and Elmer Candy Corp. v. Administrator, Employ. Sec., 286 So.2d 423 (La.App. 1973), the court relied on N.L.R.B. v. Fleetwood Trailer Co. in deciding that permanent replacement is not the equivalent of unqualified termination for the purposes of determining eligibility for unemployment benefits.

conclude that the unemployment of an applicant for benefits is no longer "due to" the labor dispute. It is up to the director to decide upon each application for benefits whether the applicant's separation from participation in the labor dispute is sufficient to warrant exemption from the statutory labor dispute disqualification. Stated succinctly, no one who maintains a position in a labor dispute that is adversary to the employer and who persists in seeking labor's particular goals in the ongoing dispute can be said to be unemployed in a manner that is not in some way "due to" or connected with the labor dispute. Such an employee is still part of the labor dispute, is still trying to accomplish labor's ends in the dispute, and is still trying to achieve the personal advantages sought by the employee in entering into the dispute. *Cf.* Building Products v. Ariz. Dept. of E. Sec., 604 P.2d 1148 (Ariz.App. 1979); Adams v. Employment Division, 717 P.2d 1199 (Or.App. 1986); Carley Ford, Linc., Mercury, Inc. v. Bosquette, 241 N.W.2d 596 (Wis. 1976); Rice Lake Creamery Co. v. Industrial Comm'n, 112 N.W.2d 202 (Wis. 1961).

The object and policy of the labor dispute disqualification is to assure "state neutrality" in labor disputes. Airport Casino, Inc. v. Jones, 103 Nev. 387, 741 P.2d 814 (1987); Depaoli v. Ernst, 73 Nev. 79, 309 P.2d 363 (1957). Employers are heard to say that neither they nor the state should in fairness be required to "finance" a strike by providing subsistence to striking workers.

Permanently replaced workers who have severed themselves from the ongoing dispute and then seek unemployment benefits do not do violence to the state's policy; but, it must be said that (as may be the case with some of the Employees in this case) if after an initial decision of eligibility, during *any week* the director finds that a successful applicant for benefits has again espoused the union's side in the labor dispute in progress, eligibility for benefits must properly be reexamined. During any week in which the director finds that such an applicant is again pursuing labor's ends in the ongoing dispute, again seeking to gain the advantages promised by successful labor action, such an applicant would become ineligible to receive benefits because of the worker's connection or "reconnection" to the labor dispute and because of this state's public policy against so "financing" the advancement of labor's cause.

We affirm the decision of the trial court but note that this affirmance does not preclude the ESD director from reexamining eligibility of any of these Employees in the light of this opinion.[5]

YOUNG, C. J., STEFFEN and MOWBRAY, JJ., concur.

---

[5]THE HONORABLE ROBERT E. ROSE, Justice, did not participate in the decision of this appeal.