704 So.2d 1055 (1997)
QUINCY CORPORATION, d/b/a Quincy Farms, Appellant,
v.
Hector P. AGUILAR, et al., Appellees.
No. 97-0284.
District Court of Appeal of Florida, First District.
November 5, 1997.
Robert L. Norton, David J. Stefany and Michael Mattimore of Allen, Norton & Blue, P.A., Tampa, for Appellant.
Robert A. Williams of Florida Legal Services, Inc., Tallahassee, for Appellees.
SMITH, Senior Judge.
The employer challenges an order of the Unemployment Appeals Commission (UAC) which affirmed the appeals referee's decision to award unemployment benefits to appellees upon a finding that the labor dispute disqualification of section 443.101, Florida Statutes (1995), no longer applied. We affirm.

I. THE LABOR DISPUTE
This case arose out of a labor dispute involving appellant, a mushroom farmer, and some of its employees, more than 100 mushroom harvesters, including appellees. The facts as determined by the appeals referee, which were found by the UAC to be supported by competent substantial evidence and which are not substantially in dispute on appeal, indicate that since 1995 there has been an ongoing controversy regarding appellant's refusal to recognize or negotiate with the organized harvesters who are affiliated *1056 with United Farm Workers, AFL-CIO. On March 14, 1996, the harvesters told their supervisor that they intended to demonstrate during both of the half-hour lunch breaks. Some of the demonstrators who refused to return to work after the first half-hour lunch break were arrested, and the others left the property as instructed by appellant through translators. There was confusion over whether the demonstrators had been fired, and one of them who tried to return to work the next day was not allowed to do so.[1] The others did not attempt to return to work, but demonstrated for several days.
On March 18, 1996, the union representative sent appellant a letter requesting clarification of the harvesters' work status and offering an unconditional return to work. Appellant did not respond to the union representative, but contacted the harvesters individually, instructing them to report to the job site and advising them that failure to do so would result in the assumption that they had no interest in returning to work. When they reported to the job site on March 21, 1996, they were each asked to sign a document stating that appellant did not recognize the union, that there was a limited number of job openings, and that to be considered eligible for job openings the harvester had to sign the document, which included a statement that the harvester offered to return to work unconditionally. Some of the harvesters signed the document prior to March 23,1996, and have been put back to work. Appellees did not sign the document; some did not understand it, some wanted their attorney or union representative to review it first, and some objected to not being put back to work right away. Appellant refused to give them copies of the document, and on March 23, 1996, it hired replacement harvesters to perform their jobs.
After consulting with their union representative, appellees reported to the job site on March 25, 1996, and signed statements making "an unconditional and unequivocal offer to return to work" with no changes in pay or working conditions. Appellant responded with letters dated March 28, 1996, acknowledging the unconditional offers to return to work and stating that each of the harvesters was being put on a preferential recall list for future openings. Appellees have continued since March 25, 1996, to demonstrate across the street from appellant's place of business and at supermarkets, seeking a union contract and a return to work. They are willing to return to work without a union contract, but they wish to retain the right to organize, to belong to the union, and to attempt negotiations with appellant for recognition of the union as their bargaining agent.[2]

II. PROCEEDINGS BEFORE THE DIVISION
Near the end of March 1996, appellees filed requests for unemployment benefits, denying that they were engaged in a strike. They stated that they had been locked out of the plant and had offered to return to work, but had not been put back to work. Appellant responded that appellees had "voluntarily quit" on March 14, 1996, because they "voluntarily elected to participate in a work stoppage & labor dispute." It asserted that appellees had been given an opportunity to return to work, that replacement workers had subsequently been hired, and that "[a]nyone who contacts us now will be put on a list and contacted for work when an opening is available." On April 10,1996, determinations were issued by the Division of Unemployment Compensation (the division), holding each appellee disqualified from receiving *1057 unemployment benefits from March 14, 1996, on the ground that the unemployment was "due to a labor dispute in active progress." This term refers to section 443.101, Florida Statutes (1995), which provides, in pertinent part:
An individual shall be disqualified for benefits:
. . . . .
4) For any week with respect to which the division finds that his total or partial unemployment is due to a labor dispute in active progress which exists at the factory, establishment, or other premises at which he is or was last employed; except that this subsection shall not apply if it is shown to the satisfaction of the division that:
(a)1. He is not participating in, financing, or directly interested in the labor dispute which is in active progress; however, the payment of regular union dues shall not be construed as financing a labor dispute within the meaning of this section; and
2. He does not belong to a grade or class of workers of which immediately before the commencement of the labor dispute there were members employed at the premises at which the labor dispute occurs any of whom are participating in, financing, or directly interested in the dispute;...
(b) His total or partial unemployment results from a lockout by his employer. For the purposes of this section, the term "lockout" shall mean a situation where employees have not gone on strike, nor have employees notified the employer of a date certain for a strike, but where employees have been denied entry to the factory, establishment, or other premises of employment by the employer. However, benefits shall not be payable under this paragraph if the lockout action was taken in response to threats, actions, or other indications of impending damage to property and equipment or possible physical violence by employees or in response to actual damage or violence or a substantial reduction in production instigated or perpetrated by employees.
There were no appeals of these initial determinations, but on April 18, 1996, a division field auditor reported that the unemployed harvesters "are not picketing at all" and that they "want their jobs back under any conditions." On April 22, 1996, the division director informed the chief of claims administration that the labor dispute "terminated effective March 25,1996." On April 24,1996, redeterminations were issued removing the disqualification as of March 25, 1996, on the ground that the unemployment was no longer "due to a labor dispute in active progress." The employer appealed these latter determinations, asserting that the labor dispute remained in active progress.
After a consolidated hearing, the appeals referee issued her notice of decision, affirming the determinations of the claims adjudicator "holding the claimants qualified for benefits based on the cessation of the labor dispute effective March 25,1996." She found that the evidence was conflicting as to the information provided to the protesting harvesters by the employer on March 14, 1996, and accepted the testimony of the harvesters. She noted some confusion at the hearing concerning how each harvester received information from the employer, but concluded that it was not necessary to resolve that confusion "because the record reflects that the workers acted cohesively in making the decision to actively engage in a labor dispute by demonstrating during scheduled working hours, to abandon the labor dispute on March 18 and to advise the employer of their unified decision to return to work unconditionally." She considered whether the harvesters were discharged on March 14, 1996, cited Meyer v. Florida Industrial Commission, 117 So.2d 216 (Fla. 2d DCA 1959),[3] and *1058 concluded "that the labor dispute which began on March 14, 1996, was initiated by the harvesters and that the employment relationship did not cease when they were advised on the same day that they would be replaced." She considered whether the harvesters had abandoned the labor dispute by March 25, 1996, noted that "once a labor dispute begins, it remains in active progress until it is finally settled, terminated or completely abandoned," and concluded that when the harvesters as a group submitted their written offer to return to work unconditionally, they "were then prepared to work without a contract and without changes in the working conditions, although they intended to continue their quest for recognition as a bargaining group." She concluded that "[b]y that time, the active progress of the labor dispute ceased." Citing George A. Hormel & Co. v. Asper, 428 N.W.2d 47 (Minn.1988),[4] she found that the fact that the harvesters "continue to demonstrate for their return to work and union recognition does not change the fact that they abandoned the labor dispute in order to unconditionally return to employment." She found that the harvesters' decision to promote a boycott of appellant's products "due to the employer's failure to put them back to work" and their organized protest "in an attempt to be put back to work" without changes in the conditions that caused their initial work stoppage "does not constitute a continuation of a strike or work stoppage by the workers."[5] She further found that on March 25, 1996, appellant accepted the harvesters' unconditional offer to return to work, but disallowed their return because it had no openings available for them, and that thus, "by agreement of the parties, the active progress of the labor dispute ended."

III. ISSUE ON APPEAL
In its order affirming the referee's action, the UAC concluded that removal of the disqualification as of March 25, 1996, based on the finding that the unemployment was no longer due to a labor dispute in active progress, was "a reasonable application of the law to the facts of this case and will not be disturbed." The issue before this court is therefore whether the Commission erred as a matter of law in accepting the referee's determination that after March 25,1996, appellees' unemployment was no longer due to "a *1059 labor dispute in active progress" and that, pursuant to section 443.101(4), Florida Statutes (1995), appellees were therefore no longer disqualified from receiving unemployment benefits.
Appellant argues that the Commission's decision imposes severe burdens upon it and requires it to fund a strike against itself, in contravention of the public policy behind the labor dispute disqualification provision.[6] However, its primary argument, both before the lower tribunals and on appeal, focuses on its contention that the Commission erred as a matter of law in construing section 443.101(4) and that, notwithstanding appellees' unconditional offer to return to work on March 25, 1997, their continuing protest of its hiring of permanent replacement workers, along with their continuing demonstrations calling attention to their desire to be returned to their jobs and to work under a contract with union recognition, constitute a "labor dispute in active progress" which disqualifies them from receiving unemployment benefits.

IV. APPLICABLE LAW
In order to determine whether the referee's and the Commission's rejection of appellant's contention is erroneous as a matter of law,[7] we have thoroughly examined the court decisions from Florida and from other jurisdictions having disqualification statutes similar to the one in effect in Florida, as well as other authorities on this and related subjects. These authorities reflect the difficulties experienced by the courts in considering the policies and principles pertinent to interpretation and application of labor dispute disqualification *1060 statutes. However, we find that a substantial body of case law supports the result reached in the case before us.
In determining whether the Commission properly construed section 443.101(4), we must consider its language and attempt to determine the legislative intent which prompted it, taking into account its historical background. Florida's original unemployment compensation statute, like the unemployment legislation enacted by most states in the late 1930s in response to the Social Security Act of 1935, took its language from one of the Social Security Board draft bills. These included a declaration of policy indicating that unemployment legislation was intended "for the benefit of persons unemployed through no fault of their own," and it also included a labor dispute disqualification provision.[8]
Many states have modified the original statutory language in various ways, but a substantial majority of the states have retained the so-called "work stoppage" type of disqualification statute included in the federal draft bills, under which an individual is disqualified from receiving unemployment compensation when the unemployment is due to a "stoppage of work" which exists because of a labor dispute.[9] In those states, workers unemployed under circumstances similar to those presented in the case before us would not be disqualified from receipt of unemployment compensation, those courts holding that unless the labor dispute causes a substantial curtailment of the employer's operations, the labor dispute disqualification does not apply.[10] In those states, the employer's act of hiring replacement workers is alone sufficient *1061 to remove the disqualification, even without an accompanying unconditional offer on the part of the striking employees to return to work.[11]
In contrast, the courts in the minority of states having "labor dispute in active progress" type disqualification statutes[12] hold that striking workers are disqualified from receiving unemployment compensation when the unemployment is due to the labor dispute, whether or not the strike results in any curtailment of the employer's operations. In circumstances similar to those presented in the case before us, these courts hold that the disqualification ends only when the unemployment is no longer "due to" the labor dispute, i.e., when the workers unconditionally offer to return to work, but work is not available because the employer has hired permanent replacement workers.[13]
Despite differences in statutory language, the focus of the analysis in these "labor dispute in active progress" states is on the current cause of the unemployment. See John Morrell & Co. v. South Dakota Department of Labor, Unemployment Insurance Division, 460 N.W.2d 141 (S.D.1990), in which the court rejected the argument that workers who had unconditionally offered to return to work, but whose jobs had been taken by replacement workers, were disqualified from receiving unemployment compensation *1062 because their initial unemployment and the hiring of replacement workers was "due to" the labor dispute. The court observed:
Additionally, the current cause analysis fully addresses the policy issues set forth by our legislature by addressing economic security while remaining neutral in labor disputes....
Throughout this labor dispute, the state remained neutral by denying benefits to striking workers. Once the labor dispute ended, however, the policy of neutrality was no longer pertinent. At that point, the state's interest in averting the crushing force of economic insecurity due to the unemployment of hundreds of workers became vital. This interest compelled payment of unemployment benefits and was fully compatible with South Dakota's labor dispute disqualification statute. Morrell would have us believe that the South Dakota legislature intended to adopt the most restrictive, unusual, and anti-labor labor dispute disqualification legislation in the United States. To give SDCL 61-6-19 that interpretation, this court would be completely ignoring our legislature's stated policy of alleviating the hardships of involuntary unemployment. Further, this court would be ignoring the policy of neutrality in labor disputes, punishing workers by denying them unemployment benefits after a labor dispute has ended. This would result in the denial of benefits to claimants who are legally entitled to receive them. No other state has made this departure, no case law supports it, and language of SDCL 61-6-19 precludes it.
Id. at 145.
In Skookum Co., Inc. v. Employment Division, 276 Or. 303, 554 P.2d 520, 521 (1976), the court held that the labor dispute disqualification ended when picket lines were removed and strikers who tried to return to work were told that no jobs were available because permanent replacements had been hired. It approved the lower tribunal's conclusion that as of the date the strikers attempted to return to work, their unemployment "was not caused by a labor dispute in active progress, but rather by the fact that their employer no longer had any work available for them." It observed:
[A]lthough it may be true, as Skookum contends, that there was no Final [collective bargaining] agreement reached as of [the date the striking workers attempted to return to work], it does not necessarily follow that the labor dispute continued to be the effective cause of claimants' unemployment after they again reported for work. In our view, the fact that no final agreement had yet been reached does not Automatically (sic) preclude a finding that, following a bona fide attempt to return to work, the claimants' continued unemployment was due to another causesuch as the fact that their employer no longer had any work available for them. Therefore, on the basis of the record in this case, we cannot say, as a matter of law, that the conclusion reached by the referee and the Appeals Board was incorrect.
Id. 554 P.2d at 522.
In re Sarvis, 296 N.C. 475, 251 S.E.2d 434 (1979), involved a determination that the labor dispute disqualification was no longer applicable when workers abandoned their strike by notifying the employer of their unconditional offer to return to work immediately, but were not reinstated because permanent replacement workers had been hired during the strike. The court ruled that under such circumstances, the employer's inability to reinstate the workers due to lack of available work "changes the cause of unemployment so as to lift the disqualification of employees for benefits" and that "the only type of active labor dispute which keeps the idle worker disqualified for benefits is one which causes unemployment." Id. 251 S.E.2d at 438.
In Piggly Wiggly of Springhill, Inc. v. Gerace, 370 So.2d 1327, 1331 (La.Ct.App. 1979), the court stated that "the determination of when a labor dispute ceases is to be made by the facts and circumstances of each case" and ruled that the labor dispute in that case was no longer "in active progress" as of the date the union was decertified as the bargaining representative and the striking workers unconditionally offered to return to work. It rejected the employer's contention *1063 that the labor dispute continued in active progress because of a boycott of its grocery store by union employees at a paper mill which was the area's largest employer, concluding that the agency's finding, that the grocery workers were not promoting or participating in a boycott to any extent that could be construed as a continuation of a labor dispute beyond the date the union was decertified, was supported by competent substantial evidence. It quoted the Louisiana Supreme Court's opinion in National Gypsum Co. v. Administrator, Louisiana Department of Employment Security, 313 So.2d 230, 233 (La.), appeal dism., 423 U.S. 1009, 96 S.Ct. 439, 46 L.Ed.2d 381 (1975):
[W]e think the more reasonable interpretation of the disqualification to be that unemployment due to `a labor dispute in active progress' includes only unemployment resulting from labor disputes in which the employee himself actively engages by refusing to work.... We thus regard the disqualification provision of La.R.S. 23:1601(4) as an expression of the public policy that the State remain neutral in labor disputes.... When employees are on strike, we have held that, by reason of the statutory policy, they cannot receive unemployment benefits. Senegal v. Lake Charles Stevedores, Inc., 250 La. 623, 197 So.2d 648 (1967). We hold today that, for similar reasons, the act was not intended to enforce a lock-out by the employer by denying unemployment benefits to employees who are available for work, but who are denied it by their employer.... We thus do not believe that a labor dispute is in active progress, insofar as disqualification for unemployment benefits is concerned, when the employees are exercising their legal right through peaceful negotiation to bargain for what they deem to be better working conditions.
In Randall, Burkart/Randall, Division of Textron, Inc. v. Daniels, 268 Ark. 375, 597 S.W.2d 71, 73 (1980), the court upheld the agency's determination that the labor dispute effectively ended for purposes of the disqualification provision when union employees ceased all strike activities and applied unconditionally for reinstatement, even though the union and the employer continued to negotiate the new collective bargaining agreement, observing:
When the employer disputed the union's right to accept its offer of settlement, the employees did not renew strike activities or suspend negotiations; they stood by their unconditional offer to return to work. Although the union and employer continue to dispute the terms and conditions under which the employees should return to work, there is no dispute about the terms and conditions under which they will return to work. When employees in fact return to work after cessation of strike activities induced by a labor dispute, the absence of a collective bargaining agreement between the union and employer is probably irrelevant but is at best only one factor which the fact finder has a responsibility to weigh in determining whether a labor dispute has ended for the purposes of unemployment compensation eligibility.
The state has no interest in withdrawing unemployment compensation from strike participants who have unconditionally offered to return to work for an employer who would willingly reinstate them if he had a job for them. Since the fact finder's decision has an adequate evidentiary base, and the award of unemployment compensation does not offend the public policies underlying unemployment compensation or the labor dispute exception, we can not disturb the award.
In Four Queens, Inc. v. Board of Review of Nevada Employment Security Department, 105 Nev. 53, 769 P.2d 49 (1989), the court affirmed a holding that previously disqualified striking workers were eligible for unemployment benefits after they offered to return to work but were told their jobs had been filled by permanent replacements and that they would be put on a preferential hiring list. It observed:
An unconditional offer to return to one's former employment or other acts which show a separation from the labor dispute may be taken by the director as evidence from which the director can conclude that the unemployment of an applicant for benefits *1064 is no longer "due to" the labor dispute.
Id. 769 P.2d at 52.
In Kraft v. Texas Employment Commission, 418 S.W.2d 482 (Tex.1967), factually very similar to the instant case although involving a somewhat differently worded statute, the employer hired replacements for striking oil workers, who later crossed the picket line with the union's permission and offered unconditionally to return to work, but were denied employment on the ground that jobs were no longer available. The opinion noted that "[a] semblance of a picket line was maintained thereafter, and the picket signs were changed from `strike' to `lockout'" and that the parties stipulated at the hearing "the labor dispute commenced by the strike called in August of the preceding year was still in existence" and the petitioners had participated in the "lockout" picketing after they were refused employment. Id. at 485. Relying on an earlier case, Texas Employment Commission v. Hodson, 346 S.W.2d 665 (Tex.Civ.App.1961), the Texas Supreme Court held that the oil workers were entitled to unemployment compensation from the date they offered to return to work. It rejected the employer's argument that Hodson was distinguishable because there was no evidence that the worker in Hodson had participated further in the labor dispute. It also rejected the contention that the Hodson court had wrongly construed the Texas disqualification statute and that disqualification was not removed by the employer's refusal to accept an unconditional offer to return to work because no work was available, but could be avoided only by the worker's "bringing himself within one of the exceptions or escape clauses of subsection (d)."[14] The Hodson court had found:
When appellee crossed his own picket line during the strike and was refused employment because there was no work available due to his job having been filled by another, his unemployment was no longer "because of a labor dispute at the factory"; it was because there was no job for him. Resort to the escape clauses, subsection (d)(1) and (2) is not required, since the basic disqualification did not then exist. A new cause of involuntary unemployment had then displaced the original disqualifying cause.
346 S.W.2d at 667. The Kraft court observed that it was "not prepared to say that respondent's theory of construction of the statute is unreasonable or untenable," but that it had found no reversible error in Hodson, and thereby necessarily approved that court's construction of the disqualification statute:
The construction placed upon the statute in that case is deemed clear, unambiguous and reasonable.... In the present case, as in Hodson, the basic disqualification no longer existed after claimants were refused work because no jobs were available, and there is no necessity to resort to the exceptions or escape clauses set forth in subsection (d).
418 S.W.2d at 486.

V. CONCLUSION
It is apparent from these decisions that labor dispute disqualification statutes similar to Florida's bar unemployment benefits only when there exist together three basic elements. There must be a "labor dispute" (i.e., a controversy between the employer and an organized group of employees regarding terms or conditions of employment) which must be in "active progress" to the extent required for disqualification purposes (i.e., the employees are refusing to work in an attempt to secure their demands and/or are engaging in other activities adversely affecting the operation of the employer's business), and the unemployment during the period for which compensation is sought must be "due to" the "labor dispute in active progress" (i.e., the actions of the workers involved in the labor dispute *1065 must be the current cause of their unemployment). When, as in the case before us, such initially disqualified workers unconditionally offer to return to work, but are denied employment because there are no jobs available to them, the labor dispute disqualification is no longer applicable to them because the cause of their unemployment is no longer their refusal to work.[15]
Appellant is essentially asking this court to adopt a rule which would, as a matter of law, continue the disqualification of striking workers even after those workers have unconditionally offered to return to work, so long as any controversy whatsoever continues to exist between them and their employer, and which would impose upon appellees, and other workers in similar circumstances, the burden of proving that they come within the subsection 443.101(4)(a) exception from disqualification by demonstrating that they are "not participating in, financing or directly interested in the labor dispute." We decline to adopt such a rule, because to do so would ignore the clear focus of section 443.101(4) on a current causation analysis. Whether the labor dispute disqualification applies in circumstances similar to those presented in the instant case will depend upon the effect of the continuing controversy, i.e., whether, during each week for which unemployment compensation is being sought, the dispute caused the unemployment. If the employer does not meet its burden of proving to the appeals referee and the Commission that the labor dispute is the current cause of the unemployment,[16] then the disqualification provision does not apply and the statutory exceptions to that disqualification do not become relevant.
We note that it may be possible, under circumstances other than those presented here, to obtain a determination that workers who have unconditionally offered to return to work continue to be disqualified from receiving unemployment compensation because their current unemployment is caused by their post-strike activities which constitute a "labor dispute in active progress." If, for example, in the instant case, appellant had pled and proven to the appeals referee that it was not able to rehire appellees after they unconditionally offered to return to work because of a substantial reduction in its production caused by a successful boycott of its products which appellees actively encouraged during the post-strike period for which they were seeking unemployment benefits, their requests for unemployment compensation might properly have been denied on the ground that the unemployment was "due to" a "labor dispute in active progress." However, no such proof was offered in this case, and we therefore decline to consider appellant's inappropriate argument on this point.
As the Commission determined, the referee's factual findings are supported by competent substantial evidence, and this court will not reweigh the evidence. The referee's legal conclusions, adopted by the Commission, are consistent with the case law construing section 443.101 and similar statutes from other jurisdictions, and therefore will not be disturbed by this court. The Commission's order is AFFIRMED.
KAHN and DAVIS, JJ., concur.
NOTES
[1] That worker has since been allowed to return to work.
[2] Under the National Labor Relations Act, "a comprehensive code passed by Congress to regulate labor relations in activities affecting interstate and foreign commerce," Nash v. Fla. Indus. Comm'n, 389 U.S. 235, 238, 88 S.Ct. 362, 365, 19 L.Ed.2d 438, 441 (1967), economic strikers who unconditionally request reinstatement are entitled to their former positions unless the employer has "legitimate and substantial business justifications" for refusing to rehire them, which would include having hired permanent replacement workers. NLRB v. W.C. McQuaide, Inc., 552 F.2d 519, 528 (3d Cir.1977). See also Shelly & Anderson Furniture Manufacturing Co. v. NLRB, 497 F.2d 1200, 1205 (9th Cir.1974) (the action of striking is not a renunciation of the employment relation, and the striker remains an employee "for the remedial purposes specified in the act").
[3] Meyer's primary holding, that the labor dispute did not terminate with the union's calling off the strike because an unfair labor practice charge relating to the strike was still pending, was nullified a few years later when the United States Supreme Court, in Nash v. Florida Industrial Commission, 389 U.S. 235, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967), quashed a similar holding as contrary to the Supremacy Clause of the Constitution. In the instant case, the appeals referee was apparently referring to the district court's statement that when Meyer was discharged and replaced, "the employer-employee relationship was not absolutely terminated but was merely temporarily suspended until the settlement of the labor dispute or until petitioner secured bona fide permanent employment elsewhere." This statement is true only in the circumstance where, as here, a striking worker is replaced but not discharged. See Marathon Elec. Mfg. Co. v. Indus. Comm'n, 269 Wis. 394, 69 N.W.2d 573 (1955); Kitchen v. G.R. Herberger's, Inc., 262 Minn. 135, 114 N.W.2d 64 (1962). See also Rice Lake Creamery Co. v. Industrial Commission, 15 Wis.2d 177, 112 N.W.2d 202 (1961), which discusses Meyer.
[4] In that case, replacement workers had been hired to fill the jobs of strikers who thereafter, through their union, made an unconditional offer to return to work. The Minnesota court declined to extend the concept of "active progress" of the underlying labor dispute to subsequent negotiations for a new collective bargaining agreement, even though picketing continued after the offer to return to work. It concluded that, "for purposes of unemployment compensation benefits," the strike disqualification "was lifted when the employees indicated that they were ready and willing to work" and that once all preconditions for returning to work had been withdrawn, the cause of the workers' unemployment "was no longer the strike or labor dispute, but rather the non-existence of available jobs." It observed that "once the active progress of a strike ends, the active progress of the labor dispute comes to a halt as well" and found that the strike in that case ended when

through the [union representative], the claimants indicated that they were willing to accept any wages and working conditions which [the employer] would make available. It mattered not that some issues remained unresolved. It mattered not that, should the offer be accepted, these employees would be working without a contract. As far as these employees were concerned, the dispute was ended....
428 N.W.2d at 54. See also Randall, Burkart/Randall, Division of Textron, Inc. v. Daniels, 268 Ark. 375, 597 S.W.2d 71 (1980); In re Sarvis, 296 N.C. 475, 251 S.E.2d 434 (1979); Skookum Co., Inc. v. Employment Division, 276 Or. 303, 554 P.2d 520 (1976), each of which is discussed in section IV of the text.
[5] In the following cases, courts have ruled that continued picketing does not invalidate the unconditional nature of an offer to return to work in the context of the labor dispute disqualification provision: NLRB v. W.C. McQuaide, Inc., 552 F.2d 519 (3d Cir.1977); George A. Hormel & Co. v. Asper, 428 N.W.2d 47 (Minn.1988); Skookum Co., Inc. v. Employment Div., 276 Or. 303, 554 P.2d 520 (1976).
[6] The Florida Legislature's declaration of public policy with respect to unemployment compensation legislation is contained in section 443.021, Florida Statutes (1995), which notes that economic insecurity due to unemployment is "a serious menace to the health, morals, and welfare of the people of this state" which requires appropriate "action by the Legislature to prevent its spread and to lighten its burden," and that the public good requires measures "for the establishment and maintenance of free public employment offices and for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own." It is widely accepted that two related purposes of labor dispute disqualification provisions in unemployment compensation legislation are to maintain the status quo which existed prior to the inception of the labor dispute so as to maintain the state's neutral position with regard to labor disputes, which are regulated by federal law, and to protect the employer from having to finance a strike against itself. Ex parte Williams, 646 So.2d 22 (Ala.1994); John Morrell & Co. v. S.D. Dep't of Labor, Unemployment Ins. Div., 460 N.W.2d 141 (S.D.1990); Randall, Burkart/Randall, Div. of Textron, Inc. v. Daniels, 268 Ark. 375, 597 S.W.2d 71 (1980); Brobston v. Employment Security Comm'n, 94 Ariz. 371, 385 P.2d 239 (1963); Kitchen v. G.R. Herberger's, Inc., 262 Minn. 135, 114 N.W.2d 64 (1962); Davis v. Aluminum Co. of America, 204 Tenn. 135, 316 S.W.2d 24 (1958); Ablondi v. Bd. of Review, Div. of Employment Sec., Dep't of Labor and Indus., 8 N.J.Super. 71, 73 A.2d 262 (App. Div.1950).
[7] Courts reviewing unemployment compensation disqualification provisions do not concern themselves with the wisdom of the statute involved, recognizing that setting of policy is a legislative function and that the judicial function is confined to interpretation and application of the statute in the light of its history, purpose, and context. Ablondi v. Bd. of Review, Div. of Employment Sec., Dep't of Labor & Indus., 8 N.J.Super. 71, 73 A.2d 262 (App.Div.1950). An agency's interpretation of the statute it administers is generally given deference, and its determination in an individual case is not disturbed unless it is based upon factual findings that are not supported by the evidence in the record or unless it is based upon an erroneous theory of law, Abadie v. Bayou Steel Corp., 645 So.2d 779 (La. 5th Cir.Ct.App. 1995), writ den., 649 So.2d 403 (La.), cert. den., Truly v. Bayou Steel Corp., 515 U.S. 1160, 115 S.Ct. 2614, 132 L.Ed.2d 857 (1995); George A. Hormel & Co. v. Asper, 428 N.W.2d 47 (Minn. 1988); Baughman v. Jarl Extrusions, Inc., 648 S.W.2d 954 (Tenn.Ct.App.1982); Skookum Co., Inc. v. Employment Div., 276 Or. 303, 554 P.2d 520 (1976); Kansas City Star Co., Flambeau Paper Co. Div. v. Dep't of Indus., Labor and Human Relations, 60 Wis.2d 591, 211 N.W.2d 488 (1973), cert. den., 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 108 (1974); Johnson v. Wilson & Co., 266 Minn. 500, 124 N.W.2d 496 (1963); Davis v. Aluminum Co. of America, 204 Tenn. 135, 316 S.W.2d 24 (1958). Unemployment compensation statutes are remedial in nature and are therefore liberally construed, while provisions disqualifying claimants from receiving unemployment benefits are considered to be exceptions which must be construed narrowly, Hormel; Davis; Dep't of Indus. Relations v. Pickett, 448 So.2d 364 (Ala.Civ.App.1983). Section 443.031, Florida Statutes (1995), provides that the unemployment compensation chapter "shall be liberally construed to accomplish its purpose to promote employment security ... and to provide through the accumulation of reserves for the payment of compensation to individuals with respect to their unemployment."
[8] See Virgil J. Haggart, Jr., Unemployment Compensation During Labor Disputes, 37 Neb.L.Rev. 668, 668-70 (1958); Thomas P. McCormick, Unemployment Compensation-An Examination of Wisconsin's "Active Progress" Labor Dispute Disqualification Provision, 1982 Wisc.L.Rev. 907, 907-11; Marc Schoenfeld, Public Benefits: The Labor Dispute Disqualification from State Unemployment Compensation and Federal Food Stamp Eligibility, 1988 Ann.Surv.Am.L. 863, 864-65, 896-97; Milton I. Shadur, Unemployment Benefits and the "Labor Dispute" Disqualification, 17 U.Chi.L.Rev. 294, 294-95 (1949). See also, Comment, The Purposes and Provisions of the "Labor Dispute" Disqualification from Unemployment Compensation, 56 N.W.U.L.Rev. 662, 662-65 (1961). While labor dispute disqualification provisions are consistent with the declared legislative intent because striking workers are considered voluntarily unemployed, courts do not consider whether the labor dispute was the fault of the employer or the employees, because to do so would violate the policy behind such a disqualification, maintaining the state's neutrality in labor disputes, see Davis v. Aluminum Co. of America, 204 Tenn. 135, 316 S.W.2d 24 (1958).
[9] Florida's original unemployment compensation statute, s. 6, ch. 18402, Laws of Florida (1937), contained such a "work stoppage" disqualification provision:

An individual shall be disqualified for benefits
. . . . .
D. For any week with respect to which the Commission finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed: Provided,
That this subsection shall not apply if it is shown to the satisfaction of the Commission that
(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and
(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute....
In 1940, the "work stoppage" language was removed or replaced with "labor dispute" and the term "in active progress" was added to "labor dispute" in the first part of the statute, CGL 1940 Supp. 4151(493). In so amending its statute, Florida placed itself among the minority of states having a so-called "labor dispute in active progress" type of disqualification statute.
[10] See, for example, Lawrence Baking Co. v. Michigan Unemployment Compensation Commission, 308 Mich. 198, 13 N.W.2d 260, 263-64, cert. den., 323 U.S. 738, 65 S.Ct. 43, 89 L.Ed. 591 (1944), in which the court found that its disqualifying statute had been changed in 1941 from a "labor dispute in active progress" provision to a "work stoppage" provision:

We are convinced that by the 1941 amendment of section 29(c) the legislature intended to disqualify an employee for benefits, only when his unemployment resulted from a stoppage or substantial curtailment of the work and operations of the employer establishment because of a labor dispute. The phrase `stoppage of work' refers to the work and operations of the employer establishment and not to the work of the individual employee.
[11] See Ex parte Williams, 646 So.2d 22 (Ala. 1994); George A. Hormel & Co. v. Asper, 428 N.W.2d 47 (1988); Johnson v. Wilson & Co., 266 Minn. 500, 124 N.W.2d 496 (1963); Davis v. Aluminum Co. of America, 204 Tenn. 135, 316 S.W.2d 24(1958).
[12] These disqualification statutes are variously worded, referring to circumstances where the unemployment is "due to" or "directly due to" or "caused by" a "labor dispute" or "trade dispute" or "strike or other bona fide labor dispute," adding "in active progress" or "still in active progress" or "as long as such labor dispute continues" or "exists." In addition to the statutes which incorporate such "active progress" language, others are considered constructive "active progress" statutes because they incorporate the core elements of the explicit "active progress" statutes: 1) a labor dispute; 2) active progress of the labor dispute at the time of the unemployment; and 3) a causal relationship between the labor dispute and the unemployment. See McCormick, Unemployment Compensation-An Examination of Wisconsin's "Active Progress" Labor Dispute Disqualification Provision, 1982 Wisc.L.Rev. 907, 908. One such constructive "active progress" statute is the Texas statute, considered in Kraft v. Texas Employment Commission, 418 S.W.2d 482 (Tex.1967), which disqualifies an unemployment compensation claimant

For any benefit period with respect to which the Commission finds that [the claimant's] total or partial unemployment is (i) due to the claimant's stoppage of work because of a labor dispute at the factory, establishment, or other premises (including a vessel) at which he is or was last employed....
The court construed this statute similarly to statutes containing the "labor dispute in active progress" language, noting that the 1955 amendment changed the statutory language from the original "total or partial unemployment is due to a stoppage of work which exists because of a labor dispute ..." to its present language which conditions the disqualification upon "the claimant's stoppage of work."
[13] See John Morrell & Co. v. South Dakota Dep't of Labor, Unemployment Ins. Div., 460 N.W.2d 141 (S.D.1990) (discussed in text); Four Queens, Inc. v. Board of Review of Nev. Employment Sec. Dep't, 105 Nev. 53, 769 P.2d 49 (1989) (discussed in text); Geo. A. Hormel & Co. v. Asper, 428 N.W.2d 47 (Minn.1988)(discussed in footnote 4); Baughman v. Jarl Extrusions, Inc., 648 S.W.2d 954 (Tenn.Ct.App.1982) (previously disqualified striking workers "became entitled to [unemployment] benefits as a matter of law" when they unconditionally offered to return to work, but their jobs had been filled by others); Randall, Burkart/Randall, Div. of Textron, Inc. v. Daniels, 268 Ark. 375, 597 S.W.2d 71 (1980) (discussed in text); Building Prod. Co. v. Arizona Dep't of Economic Sec., 124 Ariz. 437, 604 P.2d 1148 (Ct. App.1979) (the hiring of permanent replacements is not enough to remove the disqualification; striking workers must show that they have abandoned the labor dispute and unconditionally offered to return to work); Piggly Wiggly of Springhill, Inc. v. Gerace, 370 So.2d 1327 (La.Ct.App. 1979) (discussed in text); In re Sarvis, 296 N.C. 475, 251 S.E.2d 434 (1979) (discussed in text); Skookum Co., Inc. v. Employment Div., 276 Or. 303, 554 P.2d 520 (1976) (discussed in text); Kraft v. Texas Employment Comm'n, 418 S.W.2d 482 (Tex.1967) (discussed in text); Johnson v. Wilson & Co., 266 Minn. 500, 124 N.W.2d 496 (1963)(labor dispute and strike terminated "for unemployment compensation purposes" when the employees agreed to go back to work and the parties agreed to accept the decision of arbitrators on the unresolved aspects of the controversy); Special Prod. Co. of Tenn., Inc. v. Jennings, 209 Tenn. 316, 353 S.W.2d 561 (1961) (disqualification ceased to apply when the striking workers notified the employer, who had hired replacement workers, that the strike had ended and unconditionally offered to return to their jobs).
[14] Kraft v. Texas Employment Comm'n, 418 S.W.2d 482, 486 (Tex.1967). We note that the Texas "escape clauses" are similar to subsections 443.101(4)(a)1. and 2., Florida Statutes (1995), which provide an exception to disqualification if the worker whose unemployment is due to a labor dispute is not "participating, financing or directly interested in the labor dispute" and does not belong to a class of workers who are participating, financing, or directly interested in the labor dispute.
[15] Significantly, appellant cites no case where unemployment compensation benefits have been denied for non-work stopping, post-strike activities of workers who have unconditionally offered to return to work, and whose offer has been accepted by the employer's placement of their names on a preferential hiring list.
[16] See Kansas City Star Co., Flambeau Paper Co. Div. v. Department of Industry, Labor & Human Relations, 60 Wis.2d 591, 211 N.W.2d 488 (1973), cert. den., 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 108 (1974) ("A benefit claimant is presumed eligible for [unemployment] benefits and the party (the employer here) resisting payment of benefits has the burden of proving that the case comes within the disqualifying provision of the law (here, a bona fide labor dispute existed)").